United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 31, 2004**

Charles R. Fulbruge III
Clerk

REVISED May 28, 2004

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 02-30760 c/w
02-30786

PETRO-HUNT, L.L.C., *et.al,*

                    Plaintiffs – Appellees,

          VERSUS

UNITED STATES OF AMERICA, et. al,

                    Defendants,

     UNITED STATES OF AMERICA,

                    Defendant – Appellant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

     PETRO-HUNT, L.L.C., et. al,

                    Plaintiffs-Appellants,

          versus

UNITED STATES OF AMERICA, et. al,

                    Defendants-Appellees.

Appeals from the United States District Court
for the Western District of Louisiana

Before EMILIO M. GARZA, and DENNIS, Circuit Judges, and VANCE[*], District Judge.

DENNIS, Circuit Judge:

Petro-Hunt, L.L.C., Hunt Petroleum Corporation, and Kingfisher Resources, Inc., (collectively "Plaintiffs") filed a declaratory judgment action seeking to quiet title to mineral rights in approximately 180,000 acres of federally owned land within the Kisatchie National Forest. Plaintiffs claim those rights as successors in interest to 96 mineral servitudes that were created before the United States purchased the land in the 1930s. The district court granted summary judgment in favor of Plaintiffs on the grounds of <u>res judicata</u> and denied Plaintiff's request for attorneys' fees. The United States timely appeals the district court's grant of summary judgment and Plaintiffs cross-appeal on the issue of attorneys' fees. Because we reverse district court's summary judgment ruling and remand for further proceedings not inconsistent with this opinion, we need not reach the merits of Plaintiffs' cross appeal regarding attorneys' fees since plaintiffs are no longer prevailing parties.[1]

## I. BACKGROUND

In order to give the proper context to our discussion of the

---

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

[1] Prevailing party status is a prerequisite to recovering attorneys' fees under 28 U.S.C. § 2412(b).

-2-

merits of this factually dense case, we begin with a brief discussion on Louisiana mineral law, the servitudes in question, and the applicability of certain Louisiana laws to property owned by the United States.

A. Mineral Servitudes Under Louisiana Law

Louisiana law governing mineral servitudes does not recognize a separate mineral estate in oil and gas.[2] Mineral rights can be owned separate from the surface land only in the form of a mineral servitude.[3] Hence, any attempt to sell or reserve the ownership of oil and gas results in the creation of a mineral servitude, and the holder of that servitude has the right to enter the property and extract the minerals.[4] Louisiana law has long provided that a mineral servitude is extinguished by prescription resulting from ten years' nonuse.[5] The period of prescription on mineral servitudes begins to run on the date a

---

[2] Frost-Johnson Lumber Co. v. Salling's Heirs, 91 So. 207, 243–245 (La. 1920).

[3] Central Pines Land Co. v. United States, 274 F.3d 881, 884 (5th Cir. 2001).

[4] Central Pines, 274 F.3d at 884. See La. R.S. § 31:21 ("A mineral servitude is the right of enjoyment of land belonging to another for the purpose of exploring for and producing minerals and reducing them to possession and ownership."); see also Luther L. McDougal, III, Louisiana Mineral Servitudes, 61 TUL. L. REV. 1097, 1098–99 (1987).

[5] Central Pines, 274 F.3d at 884. See La. R.S. § 31:27.

servitude is created,[6] and is interrupted only by "good faith operations for the discovery and production of minerals."[7]

Because the rule of prescription reflects a public policy favoring "the timely return of outstanding minerals to the owner of the land,"[8] the rule may not be abrogated by contract.[9] The Louisiana Supreme Court has declared that "it is against the public policy of this state to allow . . . servitudes to remain alive for a longer period than 10 years without use," and that any contracts to the contrary are void as against public policy.[10]

B. <u>Creation of Mineral Servitudes</u>

In 1932, five Louisiana lumber companies – Good Pine Lumber, Trout Creek Lumber, Tall Timber Lumber, Bodcaw Lumber, and Grant Timber – entered an agreement to pool the mineral rights on their respective land holdings in central Louisiana.[11] As part of the pooling agreement, the companies created a joint venture called

---

[6] <u>See</u> La. R.S. § 31:28; <u>see also</u> <u>Ober v. Williams</u>, 35 So. 2d 219, 224 (La. 1948).

[7] La. R.S. § 31:29.

[8] <u>See</u> <u>Mire v. Hawkins</u>, 186 So. 2d 591, 597 (La. 1966).

[9] <u>See</u> <u>Leiter Minerals, Inc. v. California Co.</u>, 132 So. 2d 845, 853 (La. 1961). On the other hand, agreements to shorten the period of prescription do not conflict with public policy and are valid. <u>Id.</u>

[10] <u>Id.</u>

[11] <u>United States v. Nebo Oil</u>, 190 F.2d 1003, 1005 (5th Cir. 1951).

-4-

the "Good Pine Oil Company" and separately conveyed to that
company the rights to explore and develop their property for the
production of oil, gas, and sulphur.[12] Of these conveyances, six
that Bodcaw Lumber and Grant Timber made to Good Pine Oil between
November 12, 1932, and May 3, 1934, are relevant to this case.
All of these six conveyances involved multiple parcels of land,
many of which were non-contiguous, and thus resulted in multiple
mineral servitudes.[13]

Each of the six deeds conveying mineral rights to Good Pine
Oil contained a clause providing that the ten year period of
liberative prescription applied. Five of the deeds expressly
stipulated that "none of said [mineral] rights in any of said
lands shall be prescribed <u>unless there shall elapse a full period
of ten (10) years in which there shall be no exercise of any of
the foregoing rights or user of any of the lands</u> aforesaid under
and by virtue hereof." The sixth contained strikingly similar
language. Because the prescriptive period described in these
instruments is equivalent to the liberative prescription period
of ten years, the contract provision applying a prescriptive

---

[12] <u>Id</u>.

[13] <u>See</u> <u>Cox v. Sanders</u>, 421 So. 869, 873 (La. 1982)(stating that
"a landowner cannot create a single servitude or mineral royalty
right on two or more non-contiguous tracts; and if this is
attempted by a single instrument, there are nevertheless as many
servitudes or royalty interests as there are non-contiguous tracts
of land" and quoting <u>Whitehall Oil Co. v. Heard</u>, 197 So. 2d 672,
675 (La. Ct. App. 1967)).

period of ten years is enforceable.

C. Acquisition by the United States

In the late 1930s, the United States acquired approximately 180,000 acres of land in three Louisiana parishes (Grant Parish, Natchitoches Parish, and Winn Parish) from Bodcaw Lumber and Grant Timber for inclusion in the Kisatchie National Forest. The United States acquired the lands under the Weeks Forestry Act[14] through nine acts of sale and two judgments in condemnation.[15] Each of these eleven conveyances came after the six transactions in which Bodcaw Lumber and Grant Timber conveyed mineral rights on the lands to Good Pine Oil. Consequently, at the time of acquisition, the approximately 180,000 acres of land that the United States acquired was burdened by 96 separate mineral servitudes in favor of Good Pine Oil.

The eleven instruments of transfer (nine deeds and two judgments) conveying the lands to the United States addressed the pre-existing mineral servitudes in different ways. All but one of the instruments contained language stating that the conveyances were "subject to" one or more of the mineral deeds granting rights to Good Pine Oil. Most of these transfer instruments contained an additional clause stating that the "mention" of the earlier mineral reservation was "made solely for

_____

[14] 16 U.S.C. § 515.

[15] The record shows that the United States acquired the lands between November 28, 1934, and January 28, 1937.

-6-

the purpose of limiting vendor's warranty to the United States in present sale, and <u>the recital of the said Mineral Sale shall in nowise extend or enlarge the same in point of time</u>."

Five of the instruments (four deeds and one judgment) also contained additional mineral reservations in the name of Bodcaw Lumber or Grant Timber, which were to become effective upon the prescription of the relevant servitudes held by Good Pine Oil. For example, the February 11, 1936 deed conveying 24,943.93 acres owned by Bodcaw Lumber "specially reserved" unto Bodcaw Lumber "all of the oil, gas and other minerals . . . subject to the sales to Good Pine Oil Company, Incorporated, for a period of ten years after the expiration of the rights of the said Good Pine Oil Company, Incorporated, under the laws of the State of Louisiana." This deed further provided that this "specially reserved" right would be extended beyond ten years if the right were exercised in a particular fashion, and that if the original ten year period or any extended period terminated for nonuse, "a complete fee in the land [would] become vested in the United States." The other four instruments also contained clauses granting reversionary mineral interests to Bodcaw Lumber or Grant Timber upon the prescription of the Good Pine servitudes.[16] Each

_____

[16] Because the Good Pine servitudes were still in effect, the "reversionary" clauses were invalid. <u>See</u> <u>Liberty Farms v. Miller</u>, 45 So. 2d 610, 614 (La. 1950) ("One may not reserve reversionary rights to minerals when he is not the owner of the minerals at the time the reservation is made. It is settled that, in such instances, the reservation is ineffective and the outstanding

-7-

of the instruments stated that at the termination of the reservations, the United States would hold the land in "complete fee."

   D.   Act 315

In 1940, well after the mineral and land transactions described above were complete, the Louisiana Legislature passed Act 315 to eliminate the rule of prescription for mineral rights on lands held by the United States:

> [W]hen land is acquired by conventional deed or contract, condemnation or expropriation proceedings by the United States of America . . . , and by the act of acquisition, verdict or judgment, oil, gas, and/or other minerals or royalties are reserved, or the land so acquired is by the act of acquisition conveyed subject to a prior sale or reservation of oil, gas and/or other minerals or royalties, still in force and effect, said rights so reserved or previously sold shall be imprescriptible.[17]

The purpose of the Act was to facilitate the federal government's purchase of large tracts of land for National Forests, National Parks, military installations, and like purposes.[18]  The United States was having difficulty acquiring such tracts in Louisiana because landowners who wished to retain mineral rights were reluctant to sell their land for fear of

---

mineral interests revert to the person owning the land at the time prescription accrues.").

   [17]  See 1940 La. Acts 315; see also La. R.S. § 31:149.

   [18]  See United States v. Little Lake Misere Land Co., 412 U.S. 580, 599 & n.16 (1973) (citing Leiter Minerals, 133 So. 2d at 851).

losing mineral reservations through prescription.[19]  By making mineral servitudes on federal land "imprescriptible" – and thus "prevent[ing] the federal government from acquiring mineral rights by prescription" – Act 315 also served Louisiana's interest in taxing and regulating minerals on federal land, powers that would be in doubt should ownership of the minerals be vested in the United States.[20]

E.  Nebo Oil

In 1948, the United States filed a declaratory judgment action against the Nebo Oil Company to quiet title to the minerals on a particular servitude claimed by Nebo Oil as successor in interest to Good Pine Oil.[21]  The complaint referred to a specific parcel, approximately 800 acres in size, lying in portions of section 19 (Township 13 North, Range 6 West) and section 24 (Township 13, Range 7 West) in Natchitoches Parish. This parcel was one of several parcels acquired by the United States through a February 11, 1936 deed from Bodcaw Lumber, which totaled 24,943.93 acres.  Nebo Oil claimed a mineral servitude on the 800-acre parcel as a result of a November 12, 1932 conveyance of mineral rights from Bodcaw to Good Pine Oil.

---

[19]  Leiter Minerals, 132 So. 2d at 851.

[20]  Id. at 851–52, 854; see also Little Lake Misere, 412 U.S. at 599–600 (citing Leiter Minerals).

[21]  Sometime after December 1941, Nebo Oil Company acquired all of the mineral rights formerly held by Good Pine Oil.  See Nebo Oil, 190 F.2d at 1006.

In its complaint, the United States averred: (1) that no drilling operations had been conducted on the 800-acre parcel during the ten year period beginning on November 12, 1932; (2) that the mineral servitude on the parcel had therefore prescribed for nonuse; and (3) that Nebo Oil intended to drill a well on the land and had advised the government that the company would resist interference.  To prevent injury to its property, the United States sought declaratory relief and an order permanently enjoining Nebo Oil from entering the 800-acre parcel for mineral production.

In denying the United States relief, the District Court for the Western District of Louisiana held that the 800-acre servitude had been rendered "imprescriptible" by Act 315.[22] This court affirmed that judgment.[23]  First, this court found

---

[22] See United States v. Nebo Oil, 90 F. Supp. 73 (W.D. La. 1950).

[23] See Nebo Oil, 190 F.2d at 1003.  The district court's final decree in Nebo Oil included a broad finding that the prescriptive periods of the Louisiana Civil Code "do not apply to lands purchased by the United States under the Weeks Act, as amended, for national forest purposes . . . ."  The court further found that "under the terms of the deed from Bodcaw Lumber . . . to Good Pine Oil . . . dated November 12, 1932, and the deed from Bodcaw Lumber . . . to the United States of America dated February 11, 1936, the oil, gas and sulphur in, on and under the lands conveyed to the United States under such deed . . . , which deed covered the lands herein involved, were vested in perpetuity in Good Pine Oil . . . , its successors and assigns, and, through it, in the defendant herein, as its successor in interest."  Despite the breadth of these findings, the district court returned to the property that was actually before it when it concluded its decree: "IT IS NOW ORDERED, ADJUDGED AND DECREED that the oil, gas, and sulphur in, on and under the lands described in the complaint are vested in perpetuity in Nebo Oil Company, Inc., its successors and assigns."

that it was bound by Louisiana precedent holding that rules of prescription, including Act 315, "are retrospective in their operation."[24]  Second, we held that Act 315's elimination of the rule of prescription as to servitudes on federal land did not dispose of federal property in violation of Article IV, Section 3, clause 2 of the United States Constitution or violate the Contract Clause of the Constitution or the Due Process Clause of the Fourteenth Amendment.  The apparent reasoning was that the United States's interest in reclaiming the mineral rights through prescription was not a vested right at the time Act 315 was passed because the Good Pine servitudes had been created less than ten years earlier.[25]

F.  After Nebo Oil

Subsequent to our decision in Nebo Oil, there were two decisions concerning the retroactive applicability of Act 315 to mineral servitudes located on property owned by the United States.  First, in United States v. Little Lake Misere Land Company, the government sued to quiet title in two adjacent parcels of land in Cameron Parish, Louisiana, which it had

---

[24]  See Nebo Oil, 190 F.2d at 1008 (citing Whitney Nat'l Bank of New Orleans v. Little Creek Oil Co., 33 So. 2d 693 (La. 1947)).

[25]  See id. at 1008–10; see also id. at 1008 ("It cannot be considered a vested right if it is nothing more than a mere expectation, or hope, based upon an anticipated continuance of the applicable general laws.").

acquired under the Migratory Bird Conservation Act.[26]  The instruments of acquisition – a 1937 deed and a 1939 judgment in condemnation – reserved to Little Lake Misere oil, gas, sulphur, and other minerals for a period of ten years from the date of vesting of title in the United States.[27]  But those instruments further provided that if the initial ten year period ended and no production was occurring, or if operations subsequently ceased for more than sixty days, "the right to mine, produce and market said oil, gas, sulphur or other mineral shall terminate . . . and the complete fee title to said lands shall thereby become vested in the United States."[28]  Nevertheless, following the enactment of Act 315, the servitude holder, Little Lake Misere, asserted that the reservations had become "imprescriptible."

In a brief per curiam opinion, this court held in favor of the servitude holder, finding that the contractual terms of prescription did not apply to the servitudes in question in the light of Act 315.[29]  This holding was based on our prior decision in Nebo Oil regarding the constitutionality of the retroactive application of Act 315.[30]

---

[26]  412 U.S. at 582.

[27]  Id.

[28]  Id. at 583.

[29]  See United States v. Little Lake Misere Land Co., 453 F.2d 360 (5th Cir. 1971).

[30]  Id. at 362.

But the United States Supreme Court granted certiorari and reversed.[31]  In so doing, the Court did not expressly reject our interpretation of Louisiana law or the analysis of Act 315's constitutionality in Nebo Oil.  Instead, invoking the choice-of-law doctrine of Clearfield Trust Co. v. United States,[32] the Supreme Court held that this court erred in presuming, as a threshold matter, that Louisiana state law applied.[33] Furthermore, because Little Lake Misere involved a determination of rights under a land acquisition agreement that was "explicitly authorized, though not precisely governed, by the Migratory Bird Conservation Act" and "to which the United States itself is a party," the Supreme Court held that it was for the federal courts to "fashion" the governing rule of law in that case.[34] Determining that Act 315 would deprive the United States of "bargained-for-contractual interests" by abrogating the terms of the acquisition instruments relating to prescription, the Supreme Court held that the Act was "plainly hostile to the interests of the United States" and could not be "borrowed" as the rule of decision.[35]  Finally, the Supreme Court held that the appropriate

---

[31] See United States v. Little Lake Misere Land Co., 318 U.S. 363 (1943).

[32] 318 U.S. 580 (1943).

[33] See Little Lake Misere, 412 U.S. at 591.

[34] See id. at 594.

[35] Id. at 596.

-13-

rule of decision was to be supplied by either federal common law or "residual" state law (i.e., state law without Act 315), both of which would give effect to the contract terms.[36]

The second decision pertinent here was <u>Central Pines Land Company v. United States</u>.[37] In that case, we were called upon to revisit our <u>Nebo Oil</u> ruling in the light of the Supreme Court's opinion in <u>Little Lake Misere</u>.[38] The facts of <u>Central Pines</u> were quite similar to those of <u>Nebo Oil</u>. First, like <u>Nebo Oil</u>, <u>Central Pines</u> involved the acquisition of land by the United States in the 1930s for the Kisatchie National Forest.[39] Second, also like <u>Nebo Oil</u>, the lands so acquired were subject to a preexisting mineral servitude.[40] Finally, the successor in interest to the servitude owner also argued that Act 315 had rendered the servitude in <u>Central Pines</u> "imprescriptible."[41]

Despite the factual similarities between <u>Central Pines</u> and <u>Nebo Oil</u>, and perhaps taking a cue from the Supreme Court's <u>Little Lake Misere</u> decision, this court ruled that Act 315 did

---

[36] <u>Id.</u> at 604.

[37] 274 F.3d 881.

[38] 274 F.3d at 881.

[39] <u>See</u> <u>id.</u> at 885.

[40] <u>Id.</u>

[41] <u>Id.</u> at 886.

not apply to Central Pines.[42]  While we declined to expressly overrule Nebo Oil's constitutional analysis, we also rejected the presumption in Nebo Oil that Louisiana law governed the terms of the transactions at issue.[43]   In particular, following the analysis of Little Lake Misere, this court held that the right asserted by the United States – i.e., the right to reclaim mineral interests through prescription – was a right acquired through a duly authorized federal land acquisition agreement and, therefore, that federal choice-of-law principles applied.[44]

Applying these principles, the Central Pines court determined that Act 315 could not be borrowed as the rule of decision because, as in Little Lake Misere, it was hostile to the government's contractual interests in reclaiming minerals through the "legal rules in place at the time of contract."[45]  While acknowledging that this interest was "arguably not as powerful as the federal right to enforce explicit contractual terms" (the right at stake in Little Lake Misere), we determined that this interest outweighed any state interest in applying Act 315.[46] Noting that the "main justification" for Act 315 was to

---

[42]  274 F.3d 886.

[43]  Id. at 889-90.

[44]  Id. at 888-90.

[45]  Id. at 891.

[46]  Id. at 891–92.

facilitate federal land acquisitions, this court observed that "[such] justification has no bearing on retroactive application of Act 315, because an acquisition cannot be facilitated by a law not yet in existence."[47]  Finally, in recognition of the federal interest in the general rule of prescription, we also determined that the proper rule of decision was "residual" state law, i.e., Louisiana law without Act 315.[48]

G.  The Present Dispute

In the 1990s, the United States began granting mineral leases on certain Forest Service lands that had been burdened by Good Pine servitudes but were not involved in Nebo Oil.  The government regarded these servitudes as prescribed for ten years' nonuse.  In determining that the servitudes were subject to the rule of prescription, rather than Act 315, the United States relied on the Supreme Court's ruling in Little Lake Misere.

In response to this leasing activity, the Plaintiffs, who are successors in interest to Nebo Oil Company, initiated this declaratory judgment action on February 18, 2000.  Their complaint named the United States and various parties to whom the United States granted mineral leases or offers to lease on lands that are or were burdened by Good Pine servitudes as defendants. Plaintiffs sought a ruling declaring that they are the owners, in

---

[47]  Id. at 892 (citing Little Lake Misere, 412 U.S. at 599).

[48]  Id.

perpetuity, of those servitudes and that the mineral leases and offers to lease issued by the United States were therefore null and void. The United States argued in response to the Plaintiffs' complaint that the 95 separate mineral servitudes through which the Plaintiffs claim mineral rights are subject to prescription for nonuse and that the relevant leases and offers to lease relate to lands on which the servitudes claimed by Plaintiffs have already prescribed.

Plaintiffs filed a motion for summary judgment[49] in the district court. In their motion, Plaintiffs argued that they were entitled to judgment as a matter of law because Nebo Oil and the doctrine of res judicata or collateral estoppel[50] would bar

---

[49] Plaintiffs actually filed two motions for summary judgment. In their second summary judgment motion, Plaintiffs argued that even if the rule of prescription applied, five servitudes burdening nearly seventy percent of the 180,000 acres in dispute had not prescribed because they had exercised their rights through continuous drilling operations. The United States conceded that sufficient drilling operations had interrupted the running of prescription on some of the servitudes and introduced evidence regarding the particular histories of each of the 96 Good Pine servitudes. But the district court dismissed this second motion as moot due to its res judicata determination and expressly declined to consider the issue of whether sufficient drilling operations interrupted the prescriptive period as to any particular servitude. Because we reverse the district court's grant of summary judgment and because the district court has not had an opportunity to pass on the question of what servitudes may have prescribed, we will not reach the merits of Plaintiffs' second motion and remand this issue to the district court.

[50] Although Plaintiffs did not specifically use the term "collateral estoppel" in their motion for summary judgment, Plaintiffs' argument in favor on the motion was based on res judicata. "The rules of res judicata encompass two separate but linked preclusive doctrines: (1) true res judicata or claim

-17-

any defense raised by the United States as to the prescriptibility of the servitudes.  The United States opposed the Plaintiffs' motion for summary judgment.


H.  The District Court's  Ruling

On December 18, 2001, the district court issued a memorandum ruling granting the Plaintiffs' motion for summary judgment. Holding that res judicata barred the United States's asserted defenses to Plaintiffs' claim of ownership due to this court's decision in Nebo Oil, the district court declared that Plaintiffs were "the exclusive owners in perpetuity of the approximately 180,000 acres of mineral servitudes at issue in this case."  The district court based its ruling on this court's decision in Nebo Oil.  The court noted that the 800-acre servitude addressed in Nebo Oil burdened a parcel of land that the United States acquired in 1936 as part of a larger purchase of 24,943.93 acres and that all 24,943.93 acres were burdened by mineral servitudes that were owned in common with the 800-acre servitude.  Because the Nebo Oil decision referred to the 24,943.93-acre transaction, the district court found that Nebo Oil "applied Act 315 of 1940

_____

preclusion and (2) collateral estoppel or issue preclusion." See St. Paul Mercury Ins. Co. v. Williamson, 224 F.3d 425, 436 (5th Cir. 2002)(internal citation omitted).  Because these two doctrines are separate, collateral estoppel will be analyzed separately in this opinion.

to the mineral reservation and sale of the 24,943.93 acre tract"
and that "res judicata clearly applies" to disputes over the
minerals on this tract.

As for the remainder of the approximately 180,000 acres of
land – acquired by the United States in ten additional
transactions that were not specifically addressed in Nebo Oil –
the district court found that res judicata was also applicable
due to the factual similarity in the transactions.
Specifically, because of the similarities in the transactions
through which the United States acquired the lands and in the
earlier transactions creating mineral servitudes on the land, the
district court stated: (1) that "the entire 180,000 acres was
similarly situated to the 800 acres at issue in Nebo Oil"; (2)
that the United States had a "full and fair opportunity" (in Nebo
Oil) to "litigate the application and constitutionality of
Louisiana Act 315 to this mineral property"; and (3) that "[t]he
government should not be allowed to litigate now that which it
could have litigated 50 years ago."

Accordingly, the district court entered a final judgment on
May 29, 2002.  The United States timely appealed.

## II.  ANALYSIS

The critical issue before this court focuses on whether the
United States is precluded from challenging Plaintiffs' assertion
of ownership over all 96 of the mineral servitudes arising from

their status as successors in interest to Good Pine Oil.  Because the district court granted summary judgment, we review that decision de novo.[51]

A.    Res Judicata–A Claim Precluded by Sameness?

"Claim preclusion, or res judicata, bars the litigation of claims that either have been litigated or should have been raised in an earlier suit."[52]  The test for res judicata has four elements: (1) the parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions.[53]  In this case, there is no dispute over the competency of the Nebo Oil court, the finality of its judgment in that case, or the sameness of the parties.  The only dispute is whether this case involves the same claim or cause of action as Nebo Oil.

To determine whether two suits involve the same claim or cause of action, this court has adopted the transactional test of

---

[51]  Central Pines, 274 F.3d at 886.

[52]  In re Southmark Corp., 163 F.3d 925, 934 (5th Cir. 1999).  See Brown v. Felsen, 442 U.S. 127, 131 (1979) ("Res judicata prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding.").

[53]  Southmark, 163 F.3d at 934.

the Restatement (Second) of Judgments, § 24.[54]  Under that test,

the preclusive effect of a prior judgment extends to all rights

the original plaintiff had "with respect to all or any part of

the transaction, or series of connected transactions, out of

which the [original] action arose."[55]

> What factual grouping constitutes a 'transaction', and
> what groupings constitute a 'series', are to be
> determined pragmatically, giving weight to such
> considerations as whether the facts are related in
> time, space, origin, or motivation, whether they form a
> convenient trial unit, and whether their treatment as a
> unit conforms to the parties' expectations or business
> understanding or usage.[56]

"[T]he critical issue is whether the two actions under

consideration are based on the <u>same nucleus of operative

facts</u>."[57]

Contending that this action is not based on the same nucleus

of operative facts as the action in <u>Nebo Oil</u>, the United States

points out that it initiated the <u>Nebo Oil</u> litigation in response

to learning that Nebo Oil intended to conduct drilling operations

on a particular 800-acre parcel of federal land under a mineral

servitude that, in the view of the United States, had

---

[54] <u>Id.</u> (citing <u>Southmark Properties v. Charles House Corp.</u>, 742 F.2d 862, 870-71 (5th Cir. 1984)).

[55] Restatement (Second) of Judgments § 24(1) (1982).

[56] <u>Id.</u> § 24(2).

[57] <u>Southmark</u>, 163 F.3d at 934 (internal quotation and citation omitted).

prescribed.[58]  The operative facts of that action included: (1) the United States's purchase of the 800-acre parcel from Bodcaw Lumber on February 11, 1936; (2) the creation of the mineral servitude burdening that parcel in a November 11, 1932 conveyance from Bodcaw Lumber to Good Pine Oil; and, most importantly, (3) the history of use or nonuse of that servitude. In contrast, the United States argues that the rights asserted by the parties in this case depend on ten additional federal land acquisitions, five additional mineral conveyances to Good Pine Oil, and the drilling histories on 95 additional servitudes.

The district court found that it did not "need to delve into such matters as what constitutes contiguous tracts, the number of servitudes, and whether prescription of nonuse was interrupted by good faith operations for the discovery and production of minerals."  The district court reasoned that it was "faced with what may be viewed as a primarily legal question."  Because all of the Good Pine servitudes were similarly situated with respect to application of Act 315, the court did not expressly identify the operative facts of this case and Nebo Oil and determine that they were the same.  Instead, the district court relied on the fact that Nebo Oil addressed a federal land acquisition and the

_____

[58] The United States acknowledges that it is precluded, as a matter of res judicata, from re-litigating title to the 800-acre mineral servitude at issue in Nebo Oil.

similarity among that acquisition and the other ten acquisitions at issue here.

But the district court's reliance on the factual similarities among the various servitudes and land acquisitions was misplaced. As the United States correctly points out, these observations of factual similarity, although potentially relevant for purposes of collateral estoppel, are not relevant to <u>res judicata</u>. Collateral estoppel prevents parties from re-litigating the same issues conclusively determined between them in a previous action. Although similar in principle, true <u>res judicata</u> is concerned with a sameness of operative facts. Neither the Plaintiffs nor the district court have identified a principle of <u>res judicata</u> that requires an owner of separate properties to litigate title to all of those properties in response to a threat to his right of full use and enjoyment of only one of them.[59] While an action to quiet title in one property may raise the same legal issues that would also be in question in an similar type of action involving a similarly

---

[59] Like the district court, the Plaintiffs seize on the Supreme Court's statement in <u>Nevada v. United States</u>, 463 U.S. 110, 129 n.10 (1983), that "[t]he policies advanced by the doctrine of <u>res judicata</u> perhaps are at their zenith in cases concerning real property, land and water." While this is certainly true, nothing in the <u>Nevada</u> opinion undermines the principle that the doctrine of res judicata does not bar a second action unless it is the "same cause of action" as the first one. <u>See</u> <u>id.</u> at 130 ("To determine the applicability of <u>res judicata</u> to the facts before us, we must decide first if the 'cause of action' which the Government now seeks to assert is the 'same cause of action' that was asserted [previously].").

situated property, the operative facts of the two actions would be distinct.

In this case, each of the Good Pine servitudes was a distinct real right under Louisiana law.[60]  The <u>Nebo Oil</u> action involved one servitude burdening an 800-acre parcel of land and was filed in response to a threat to the United States's asserted right of full use and enjoyment of that land.  The United States took the position that the servitude was subject to prescription and had prescribed, and therefore it had to show ten years' nonuse <u>of that particular servitude</u> to succeed on its claim.  The existence and use histories of the other Good Pine servitudes were not operative facts of either the government's claim or Nebo Oil's defense to that claim.  Although the reasoning of <u>Nebo Oil</u> – that the Good Pine servitudes were imprescriptible due to Act 315– made the use histories irrelevant as a matter of law, each servitude remained a distinct real right.  If <u>Nebo Oil</u> remains good law, this court's holding that Act 315 rendered the Good Pine servitudes imprescriptible is final and conclusive between the United States and the Plaintiffs as a matter of collateral estoppel.  But <u>res judicata</u> is no bar to the United States's defense in this action because its claim with respect to each servitude depends on a unique set of operative facts. Thus, if

---

[60]  <u>See</u> McDougal, <u>supra</u> note 4, at 1099.

the United States's defense of this action is limited, it would

be limited only under collateral estoppel.

B.    Collateral Estoppel–An Issue Precluded by Prior Litigation?

Collateral estoppel precludes a party from litigating an

issue already raised in an earlier action between the same

parties[61] only if: (1) the issue at stake is identical to the one

involved in the earlier action; (2) the issue was actually

litigated in the prior action; and (3) the determination of the

issue in the prior action was a necessary part of the judgment in

that action.[62]  In this circuit, collateral estoppel applies to

"pure questions of law" only when there has been no "change in

controlling legal principles."[63]  The United States contends that

---

[61] "Mutuality" is a prerequisite only when the party to be estopped is the United States.  See United States v. Mendoza, 464 U.S. 154 (1984).

[62] Stripling v. Jordan Prod. Co., LLC, 234 F.3d 863, 868 (5th Cir. 2000).

[63] See, e.g., Hicks v. Quaker Oats Co., 662 F.2d 1158, 1167 (5th Cir. 1981)(discussing the effect of Montana v. United States, 440 U.S. 147 (1979) on the exception to collateral estoppel explained in United States v. Sunnen, 333 U.S. 591 (1948), and concluding that post-Montana, Sunnen stands only for the proposition that "estoppel would not apply where there had been a change in controlling legal principles between the two decisions."); EEOC v. Am. Airlines, Inc., 48 F.3d 164, 170 (5th Cir. 1995)(quoting Montana, 440 U.S. at 161, for the proposition that "a significant change in the legal climate may defeat collateral estoppel where modifications in controlling legal principles . . .could renders a previous determination inconsistent with the prevailing doctrine."); RecoverEdge, L.P. v. Pentecost, 44 F.3d 1284, 1291 (5th Cir. 1995)(stating "As one treatise points out, however, 'courts have readily perceived that for purposes of preclusion, 'issues are not identical if the second action involves application

collateral estoppel does not apply in the present case because it seeks to raise issues that are not identical to the issues litigated in <u>Nebo Oil</u> and, in any event, there has been a change in controlling legal principles.  We agree.

In ruling that the United States is precluded from re-litigating the applicability of Act 315 to the Good Pine servitudes, the district court did not specify what particular issues were actually litigated in <u>Nebo Oil</u>.  But, as the United States discusses in its brief, the question of Act 315's applicability to this case can be divided into three distinct sets of legal issues.  First, there are threshold choice-of-law issues, including whether the rights arising out of the federal land acquisitions are governed by state law (including Act 315) or by federal law, and, if federal law governs, whether and what provisions of state law should be "borrowed" to provide the rules of decision.[64]  Second, there are issues regarding the interpretation of Act 315 under state law, including the question

of a different legal standard, even though the factual setting of both suits is the same.'" citing 18 Wright, Miller & Cooper, *Federal Practice and Procedure* § 4417, at 165 (footnote omitted)(quoting <u>Peterson v. Clark Leasing Corp.</u>, 451 F.2d 1291, 1292 (9th Cir. 1971); <u>Brister v. A.W.I., Inc.</u>, 946 F.2d 350, 354 n.1 (5th Cir. 1991)(explaining that "not only the facts, but also the legal standard used to assess them, must be identical" and citing <u>Southern Pac. Transp. Co. v. Smith Material Corp.</u>, 616 F.2d 111, 115 (5th Cir. 1980)).

[64] <u>See</u> <u>Little Lake Misere</u>, 412 U.S. at 590-604; <u>Central Pines</u>, 274 F.3d at 887-92.

whether Act 315 is to be applied retroactively.  Finally, there are issues concerning whether applying Act 315 retroactively is constitutional.  That these issues are distinct legal issues cannot be doubted after this court's ruling in Central Pines.[65]

Nebo Oil only addressed the latter two sets of issues.[66] That is, in Nebo Oil, this court assumed the applicability of Act 315, confined its analysis to an interpretation of the Act under state law, and determined that the Act did not violate the federal constitution.[67]  In the present case, the United States does not seek to revisit the issues actually addressed in Nebo Oil.  Instead, it seeks to raise the threshold choice-of-law issue that Nebo Oil did not address because it was presumed.  In particular, the United States contends that: (1) federal law governs the rights arising out of its acquisition of the lands at issue in this case;[68] (2) Act 315 may not be borrowed as the rule of decision because it is hostile to the United States's contractual interests;[69] and (3) the rule at the time of the

---

[65] See 274 F.3d at 889-90.

[66] See id. (describing the scope of Nebo Oil).

[67] See id.

[68] See Little Lake Misere, 412 U.S. at 594; Central Pines, 274 F.3d at 887-90.

[69] See Central Pines, 274 F.3d at 890-92.

contract (<u>i.e.</u>, the Louisiana rule of prescription) should govern.[70]

Because these questions of law are not "identical" to the issues raised in <u>Nebo Oil</u> and were not "actually litigated" in <u>Nebo Oil</u>, we find that the United States is not precluded, under collateral estoppel, from raising them in this case.[71]  Although the Plaintiffs cite scattered portions of both the district court's opinion and the United States's brief in <u>Nebo Oil</u> in an effort to show that the choice-of-law issue was determined in that action, we stand by our prior finding in <u>Central Pines</u> that it was not.[72]

Nevertheless, even if the choice-of-law issue had been raised in <u>Nebo Oil</u>, changes in the controlling legal principles prevent the United States from being precluded from litigating the issue in this case.[73]  After the decisions in <u>Little Lake Misere</u> and <u>Central Pines</u>, it is clear that federal law governs

---

[70] <u>See</u> <u>id.</u> at 892.

[71] <u>RecoverEdge</u> 44 F.3d at 1290.

[72] <u>See</u> 274 F.3d at 889-90.

[73] The Plaintiffs' argument that the Supreme Court's decision in <u>United States v. Stauffer Chem. Co.</u>, 464 U.S. 165 (1984), compels a contrary conclusion is mistaken.  In that case, there had been no change in controlling legal principles between the first and the second action.  <u>See</u> <u>id.</u> at 170.  The Court was concerned, instead, with the exception to the otherwise applicable rules of preclusion for "unmixed questions of law" arising in "successive actions involving unrelated subject matter."  <u>See</u> <u>id.</u>  The United States does not rely on this exception in this case.

the choice-of-law decision presented by the facts of this case. Hence, we are prohibited from borrowing Act 315 as the federal rule of decision because it is hostile to the federal interests at stake.[74]

## III. CONCLUSION

Because neither <u>res judicata</u> nor collateral estoppel preclude the United States from challenging Plaintiffs' assertion of ownership over the mineral servitudes in question, we reverse the district court's grant of summary judgment. In addition, we find that the 95 servitudes that were not at issue in <u>Nebo Oil</u> are subject to the contractual provisions permitting prescription after ten years' nonuse. Accordingly, we remand this case so that the district court can determine which servitudes have in fact prescribed.

**REVERSED AND REMANDED.**

---

[74] <u>See</u> <u>Central Pines</u>, 274 F.3d at 888-90.