# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 18, 2021

Lyle W. Cayce
Clerk

No. 20-50179

Academy of Allergy & Asthma in Primary Care; United Biologics, L.L.C., doing business as United Allergy Services,

*Plaintiffs—Appellants*,

*versus*

Quest Diagnostics, Incorporated,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:17-CV-1295

Before Stewart, Higginson, and Wilson, *Circuit Judges*.

Carl E. Stewart, *Circuit Judge*:

Plaintiffs-Appellants Academy of Allergy & Asthma in Primary Care ("AAAPC") and United Allergy Services ("UAS") sued Quest Diagnostics ("Quest") for conspiring to force them out of the market of providing allergy and asthma testing. The district court dismissed Plaintiffs' claims under Rule 12(b)(6). We AFFIRM in part and REVERSE and REMAND in part.

No. 20-50179

## I. FACTUAL AND PROCEDURAL HISTORY

### A. Factual Background

In 2009, UAS began providing allergy testing and treatment services in Texas. UAS's services allowed primary care physicians to treat allergies, disrupting the standard practice that required doctors to refer patients to allergists for treatment. Quest is one of the leading laboratories that receive patient referrals. Phadia is an allergy test producer and a defendant in Plaintiffs' 2014 suit.[1]

According to Plaintiffs' complaint, Quest and Phadia began discussing ways to curtail competition posed by UAS in 2011. The two businesses created a "talking points letter" to be distributed by their employees to discourage doctors from working with UAS. The letter fabricated warnings about patient safety, medical and legal liability, and the risks of fraudulent billing associated with UAS's testing products.

Unaware that Quest and Phadia were working to push UAS out of the market, UAS began negotiating with Quest to provide alternative methods of allergy testing. Phadia instructed Quest not to work with UAS, and Quest passed along confidential information about UAS to Phadia. Notably, Quest shared UAS's customer list with Phadia in 2012. Phadia then targeted those customers and tried to convince them to cease their relationships with UAS. Quest and Phadia also used a misleading opinion from the Office of the Inspector General of Health and Human Services ("OIG") that cautioned against businesses like UAS.[2] Through 2014, Quest and Phadia trained their

---

[1] Plaintiffs' 2014 suit will be discussed *infra* Section B.1.

[2] James Wallen, an associate and alleged co-conspirator of Phadia and Quest, put together a company called Universal Allergy Labs, LLC, not to be confused with Plaintiffs' United Allergy Labs (the predecessor to UAS). The Office of the Inspector General Opinion referred to UAL and expressed serious concerns about businesses providing

No. 20-50179

employees to tell physicians and providers about the opinion and to spread misinformation about UAS.

From 2014 to 2016, Quest and Phadia continued to disparage UAS and to conspire to remove it from the market. In September 2014, Phadia and Quest used a Superior Health Plan policy change (that was announced in June 2014 and enacted in August 2014) to convince primary care physicians to stop working with UAS.

As a result of Quest and Phadia's actions, competition declined and the two entities now account for more than 70% of the local market share in allergy testing and immunotherapy.

### B. Procedural History

#### 1. The 2014 Lawsuit

In January 2014, UAS began tracking which customers were targeted with disinformation about its testing products. Unaware that Phadia or Quest were involved in spreading the disinformation, UAS filed both state and federal antitrust claims against several physicians. *Acad. of Allergy & Asthma in Primary Care v. Am. Acad. of Allergy*, No. SA–14–CV–35–OLG, 2014 WL 12497080, at *2 (W.D. Tex. Sep. 8, 2014). As the lawsuit progressed through discovery, Plaintiffs learned of Phadia's role and amended their complaint to add Phadia as a defendant in 2015.

Plaintiffs soon sought discovery from Phadia, and they began to suspect that Quest might have knowledge of Phadia's conduct. Plaintiffs subpoenaed Quest's corporate representative and requested document

---

allergy tests being run by a single person with no healthcare experience. Plaintiffs argue that Wallen intentionally "sandbagged" the review process to get an unfavorable decision so that it could be used to falsely equate Wallen's company with Plaintiffs.

production in December 2015. Quest responded in January 2016 with several objections. Quest provided a representative in May 2016, and only then did Plaintiffs learn of Quest's involvement.

The physicians and Phadia settled Plaintiffs' 2014 suit. The remaining defendants (Allergy Asthma Network/Mothers of Asthmatics, Inc. ("AANMA") and Tonya Winders, Phadia's former market development leader and new CEO of AANMA) went to trial, and a jury found them not liable.

## 2. The Current Suit

The deadline for Plaintiffs to add Quest to their 2014 suit occurred before Quest responded to Plaintiffs' subpoenas. Once Plaintiffs learned of Quest's involvement, they filed this suit against Quest on December 28, 2017.

Quest moved to dismiss on March 9, 2018. The district court granted Quest's motion on February 22, 2019. The district court dismissed Plaintiffs' antitrust claims as time-barred, concluding that Plaintiffs had not alleged that Quest committed overt acts within the four-year statute of limitations. The court dismissed Plaintiffs' state law tortious interference and civil conspiracy claims as time-barred by Texas's two-year statute of limitations. The court also dismissed Plaintiffs' misappropriation of trade secrets claim as time-barred because it was not filed within three years of when Plaintiffs discovered or could have discovered the misappropriation through ordinary diligence.

Plaintiffs requested leave to amend, and the district court denied their request. Plaintiffs then submitted a Rule 59(e) motion, and the district court denied it because it failed to raise new arguments. This appeal followed.

No. 20-50179

## II. STANDARD OF REVIEW

This court reviews de novo a district court's grant of a Rule 12(b)(6) motion to dismiss. *Gregson v. Zurich Am. Ins. Co.*, 322 F.3d 883, 885 (5th Cir. 2003). We construe all allegations in favor of the plaintiff. *Id.*

"[D]ismissal for failure to state a claim based on the statute of limitations defense should be granted only when the plaintiff's potential rejoinder to the affirmative defense was foreclosed by the allegations in the complaint." *Jaso v. The Coca Cola Co.*, 435 F. App'x 346, 352 (5th Cir. 2011) (internal quotation marks omitted).

## III. DISCUSSION

Plaintiffs appeal the district court's dismissal of the following seven claims against Quest: (1) Sherman Act § 1, (2) Sherman Act § 2, (3) Texas antitrust, (4) Texas misappropriation of trade secrets, (5) Texas tortious interference with contracts, (6) Texas tortious interference with existing and prospective business, and (7) Texas civil conspiracy.

### A. Dismissal of Plaintiffs' Federal and State Antitrust Claims

Plaintiffs alleged that Quest violated §§ 1 & 2 of the Sherman Act and Texas antitrust law. The district court dismissed these claims under Rule 12(b)(6), concluding that they were time-barred. We disagree.

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Texas law also prohibits restraints on trade. *See* TEX. BUS. & COM. CODE § 15.05(a) ("Every contract, combination, or conspiracy in restraint of trade or commerce is unlawful."). Section 2 of the Sherman Act prohibits persons from "monopoliz[ing], attempt[ing] to monopolize, or combin[ing] or

conspir[ing] . . . to monopolize any part of the trade or commerce among the several States . . . ." 15 U.S.C. § 2.

Both federal and Texas law have four-year statutes of limitations for antitrust claims. *See* 15 U.S.C. § 15(b); TEX. BUS. & COM. CODE § 15.25. "Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971).

Under the general rule, Plaintiffs had four years to bring their claims against Quest from the date of Quest's latest overt act. The district court determined that the last overt act was Quest's August 2013 meeting with Phadia about UAS's insurance reimbursement. Plaintiffs filed suit on December 28, 2017. Because Plaintiffs' claims were not brought by August 2017, the district court dismissed them as time barred.

In concluding that Quest's latest overt act occurred in August 2013, the district court disregarded several of Plaintiffs' allegations that described later overt acts. The district court determined that these allegations were insufficient because they lacked specificity, described mere "aftershocks" of earlier overt acts, or only described Phadia's actions as a potential co-conspirator (and not Quest's actions). We agree that many of the allegations lacked specificity or described aftershocks of earlier acts, but we disagree as to the allegations of Phadia's role as a potential co-conspirator.

### 1. Lack of Specificity in Allegations of Later Acts

Plaintiffs point to their allegations that Quest continued to injure their businesses in 2014 and 2015. They argue that those allegations sufficiently describe later overt acts and that the statute of limitations should reset based on those overt acts. We disagree.

No. 20-50179

Plaintiffs alleged before the district court that "Phadia and Quest continued to approach individual providers and payors in 2014 and 2015 regarding the negative impact UAS was having on their ImmunoCAP sales. Quest and Phadia continued to work with other co-conspirators to minimize the competitive threat." The district court discounted this allegation from Plaintiffs as insufficiently specific to restart the statute of limitations. The district court cited *Poster Exchange Incorporated v. National Screen Service Corporation*, 517 F.2d 117 (5th Cir. 1975). In *Poster Exchange Inc.*, we remanded an antitrust case to determine whether there was a specific act or word of refusal contributing to the antitrust conspiracy during the limitations period. *Id.* at 128–29.

Later, we decided *Rx.com v. Medco Health Solutions, Inc.*, 322 F. App'x 394 (5th Cir. 2009). In *Rx.com*, we did not allow the plaintiffs to toll the statute of limitations by merely alleging that the defendants continued their earlier violations of antitrust law. *Id.* at 397. We reiterated the Supreme Court's rule that "each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and . . . the statute of limitations runs from the commission of the act." *Id.* (quoting *Zenith Radio Corp.*, 401 U.S. at 338).

Plaintiffs' allegations about Phadia and Quest's continued meetings with providers and payors mirror the allegations we rejected in *Rx.com*. These allegations do not restart the statute of limitations because they did not describe a specific act or word contributing to the conspiracy. *See Poster Exch. Inc.*, 517 F.2d at 128–29.

### 2. Allegations of "Aftershocks" of Earlier Events

Plaintiffs next argue that the district court erred by concluding that a policy change that took effect in June 2014 was not an overt act that would reset the statute of limitations. Plaintiffs alleged that a June 2014 policy

7

change that discouraged providers from working with UAS was a timely overt act. The district court disagreed, concluding that the overt act associated with the policy change occurred in August 2013. We agree with the district court.

"Aftershocks" are lingering effects of earlier overt acts in an antitrust conspiracy. They are not events that restart the statute of limitations because "a newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations action." *Poster Exch. Inc.*, 517 F.2d at 128.

Here, the district court determined that the overt act occurred in August 2013 when Quest and Phadia lobbied for the policy change. It follows that the policy's implementation was an aftershock of Quest and Phadia's earlier lobbying rather than an independent action. Phadia and Quest did not continue to act after they lobbied for the new policy, so the policy's implementation was merely a delayed result of their earlier actions. This allegation does not suffice to restart the clock for Plaintiffs' claims.

Accordingly, the district court properly concluded that Plaintiffs' allegation regarding the June 2014 policy change does not suffice to restart the statute of limitations.

### 3. Allegations of Phadia's Involvement

Next, Plaintiffs argue that the district court erred by concluding that their allegations as to Phadia's conduct could not restart the statute of limitations. We agree.

The district court disregarded Plaintiffs' allegations of Phadia's post-2013 overt acts because they were "actions taken wholly by Phadia." Plaintiffs alleged that in May 2014, Phadia's Dallas district manager emailed

Quest's directors about their collaboration to discourage providers from working with UAS. The manager indicated that he had recently met with Timothy McDaniel (another Quest employee), and the manager sent out a list of several providers that they should further target.

Plaintiffs argue that Phadia's manager's meeting with McDaniel was an overt act by a co-conspirator that occurred within four years of Plaintiffs' suit. They rely on *United States v. Therm-All, Inc.*, 373 F.3d 625 (5th Cir. 2004). In *Therm-All, Inc.*, various corporations and their presidents were indicted for conspiring to fix prices. *Id.* at 628. Though five companies were involved in the price fixing, only two of them were parties to the underlying dispute in *Therm-All, Inc. Id.* at 629–32. The defendants argued that the government's claims against them were barred because the government failed to introduce evidence that the illegal actions occurred within the statute of limitations. *Id.* at 631. However, testimony of non-party co-conspirators was introduced as evidence that the conspiracy continued into the limitations period. *See id.* at 636 ("Rhodes (of Mizell Co.) testified that the conspiracy continued through June 1995. The testimony is direct evidence that the participants were involved in conspiratorial acts . . . .").

Here, the district court ruled that Phadia's actions were insufficient to restart the statute of limitations, even if its actions were in furtherance of the conspiracy. The district court's view is inconsistent with our precedent in *Therm-All, Inc.*

Moreover, Quest's argument that Phadia cannot be a co-conspirator here because it was a defendant in the 2014 lawsuit is incorrect. Phadia settled in the 2014 suit, but no court ever determined its liability as a co-conspirator. Collateral estoppel would bar Plaintiffs from arguing that Phadia is a co-conspirator only if Phadia's liability was "actually litigated in the prior action" and was determined as "a necessary part of the judgment in that

action." *See Petro-Hunt, L.L.C. v. United States*, 365 F.3d 385, 397 (5th Cir. 2004).

Phadia cites *Discon Inc. v. Nynex Corp.*, where a district court held that a plaintiff was collaterally estopped from asserting a conspiracy claim against a second co-conspirator after a jury determined that the first co-conspirator was not liable. 86 F. Supp. 2d 154, 167 (W.D.N.Y. 2000). The alleged conspiracy involved only two co-conspirators. *Id.* An acquittal of one co-conspirator meant that there was no conspiracy as between the two of them, and the district court concluded that the second suit was barred. *Id.*

Here, the conspiracy involved many actors, including allergists, Tonya Winders, AANMA, Phadia, and now Quest. The jury determined that Winders and AANMA were not liable, but it did not determine Phadia's liability. Collateral estoppel does not bar Plaintiffs from asserting that Phadia is a co-conspirator. Plaintiffs may use the allegations of co-conspirators (and the timing of those actions) in future suits. *See Therm-All, Inc.*, 373 F.3d at 636.

At this stage of litigation, Plaintiffs have sufficiently alleged that Phadia and Quest were involved in the alleged conspiracy and that the allegation regarding Phadia's May 2014 email reset the statute of limitations. We therefore disagree with the district court and reverse its dismissal of Plaintiffs' state and federal antitrust claims.

### B. Dismissal of Plaintiffs' Tort Claims

The district court also dismissed Plaintiffs' claims for misappropriation of trade secrets, civil conspiracy, and tortious interference. We reverse the dismissal of Plaintiffs' misappropriation of trade secrets claim. We affirm the dismissal of the civil conspiracy and tortious interference claims.

No. 20-50179

*1. Misappropriation of Trade Secrets Claim*

Plaintiffs filed a misappropriation of trade secrets claim against Quest, arguing that Quest misappropriated UAS's client list. UAS shared its client list with Quest when the two were discussing doing business together, and Quest sent the list to Phadia in February 2012 (more than five years before Plaintiffs filed suit against Quest). Under Texas law, "[a] person must bring suit for misappropriation of trade secrets not later than three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." TEX. CIV. PRAC. & REM. CODE ANN. § 16.010(a).

The district court dismissed Plaintiffs' trade secrets claim because "UAS and AAAPC fail[ed] to explain why they could not have discovered the misappropriation through ordinary diligence in the months following February 2012."

Plaintiffs argue that they did not know that Quest shared their customer list with Phadia in 2012. They only knew that Quest declined to move forward with Plaintiffs' deal to provide allergy testing. They learned of Quest's involvement in May 2016 when Quest produced discovery during the 2014 lawsuit. Because they did not discover Quest's involvement until May 2016, Plaintiffs argue that the statute of limitations should be tolled until that time.

The discovery rule "defers accrual . . . until the plaintiff knew, or exercising reasonable diligence, should have known of the wrongful act causing injury." *N. Tex. Opportunity Fund v. Hammerman & Gainer Int'l., Inc.*, 107 F. Supp. 3d 620, 635–36 (N.D. Tex. 2015) (quoting *Jackson v. W. Telemarketing Corp. Outbound*, 245 F.3d 518, 523–24 (5th Cir. 2001)). The fact that Plaintiffs did not actually know of Quest's involvement until 2016 will not preserve their claim unless they also could not have discovered their

misappropriation injury using ordinary diligence. The discovery rule does not apply "simply because a claimant does not know 'the specific cause of the injury,' 'the party responsible for it,' 'the full extent of it,' or 'the chances of avoiding it.'" *USPPS, Ltd. v. Avery Dennison Corp.*, 326 F. App'x 842, 847 (5th Cir. 2009) (quoting *PPG Indus. Inc. v. JMB/Hous. Ctrs. Partners Ltd.*, 146 S.W.3d 79, 93–94 (Tex. 2004)).

The discovery rule is a limited exception to statutes of limitation and will only be applied "when the nature of the plaintiff's injury is both inherently undiscoverable and objectively verifiable." *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 734 (Tex. 2001). "Texas courts have set the inherently undiscoverable bar high, to the extent that the discovery rule will apply only where it is nearly impossible for the plaintiff to be aware of his injury at the time he is injured." *Sisoian v. Int'l Bus. Machs. Corp.*, No. A-14-CA-565-SS, 2014 WL 4161577, at *4 (W.D. Tex. Aug. 18, 2014) (quoting *Priester v. JP Morgan Chase Bank, N.A.*, 708 F.3d 667, 675 (5th Cir. 2013)).

In considering the applicability of the discovery rule at the motion to dismiss stage, our inquiry is whether, accepting all well-pleaded facts as true, Plaintiffs' alleged injury, "by its nature, is unlikely to be discovered within the prescribed limitations period despite due diligence." *Beavers v. Metro. Life Ins. Co.*, 566 F.3d 436, 440 (5th Cir. 2009) (quoting *Wagner*, 58 S.W.3d at 734–35). Defendants bear the burden of proof on the statute of limitations defense. *Jaso*, 435 F.App'x at 351. "With respect to the statute of limitations defense, dismissal at the 12(b)(6) stage is proper only 'where it is evident from the [complaint] that the action is barred and the [complaint] fail[s] to raise some basis for tolling.'" *Id.* (quoting *Jones v. Alcoa Inc.*, 339 F.3d 359, 366 (5th Cir. 2003) (alterations in original)).

The district court rejected Plaintiffs' allegations and suggested that Plaintiffs could have learned that Quest misappropriated their client list.

Reasonable diligence requires parties to make general inquiries to knowledgeable parties. *See Target Strike, Inc. v. Marston & Marston Inc.*, 524 F. App'x 939, 945 (5th Cir. 2013). On appeal, Plaintiffs assert that even if they learned which customers stopped working with UAS, they would not have learned that Quest shared their customer list with Phadia.

We agree that even if Plaintiffs had exercised due diligence by inquiring with their customers, it is unlikely that they would have learned that Quest shared UAS's proprietary billing information and business records. Plaintiffs' trade secret injury was unlikely to be discovered given the nature of Plaintiffs' trade secret[3]—a client list. While the misappropriation of other proprietary information like computer codes[4] or product designs[5] may be readily discoverable once the information appears in the marketplace, Plaintiffs could not have discovered their misappropriation injury as easily.

We therefore find it unlikely that they could have discovered the distinct injury to their trade secret caused by Quest. We conclude that Plaintiffs' trade secret injury, by its nature, was unlikely to have been discovered within the limitations period even if Plaintiffs had exercised due diligence. *See Beavers*, 566 F.3d at 440.

Plaintiffs have sufficiently pled they could not have discovered their misappropriation injury using reasonable diligence. Moreover, nothing in the complaint forecloses Plaintiffs' potential rejoinder to the statute of limitations defense. *See Jaso*, 435 F. App'x at 351. We thus disagree with the

---

[3] "A trade secret is any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *Computer Assoc. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996).

[4] *See Altai, Inc.*, 918 S.W.2d at 457.

[5] *See Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 365–66 (5th Cir. 2000).

district court's dismissal of Plaintiffs' misappropriation of trade secrets claim and reverse.

### 2. Civil Conspiracy Claim

The district court dismissed Plaintiffs' civil conspiracy claim as time-barred. Plaintiffs argue that their civil conspiracy claim is also subject to the discovery rule and therefore timely. Here, we disagree.

Plaintiffs' conspiracy claim is based on Quest and Phadia's actions dissuading providers from using UAS's services. Civil conspiracy claims are generally subject to a two-year statute of limitations. *Navarro v. Grant Thornton, LLP*, 316 S.W. 3d 715, 719 (Tex. App.—Houston [14th Dist.] 2010, no pet.). Like their misappropriation of trade secrets argument, Plaintiffs argue that this information could not have been discovered within the initial statute of limitations. *See Sisoian*, 2014 WL 416157, at *4.

We are unpersuaded by Plaintiffs' argument that they could not discover the injuries caused by Quest and Phadia's alleged civil conspiracy. Unlike their trade secrets injury, the only injuries Plaintiffs alleged here relate to their businesses and ability to compete in the marketplace. We fail to see how those injuries are inherently undiscoverable, particularly since these injuries were litigated in Plaintiffs' 2014 suit against Phadia.[6]

Our analysis is unaltered by the argument that Quest's role in the conspiracy might have been inherently undiscoverable during the limitations period. The discovery rule analysis turns on whether an injury is inherently undiscoverable, not on whether particular actions or causes are undiscoverable. *See Beavers*, 566 F.3d at 440. Unlike Plaintiffs'

---

[6] Plaintiffs' misappropriation of trade secrets claim was not litigated in the 2014 suit, probably because Plaintiffs did not yet know of Quest's involvement or that Quest shared the customer list with Phadia.

misappropriation claim, there is no inherently undiscoverable injury that stems from the civil conspiracy.

Plaintiffs also argue that Quest's fraudulent concealment of its alleged wrongdoing may toll the statute of limitations. We disagree.

Fraudulent concealment tolls the statute of limitations only until "the fraud is discovered or could have been discovered with reasonable diligence." *Shell Oil Co. v. Ross*, 356 S.W.3d 924, 927 (Tex. 2011) (quoting *BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 67 (Tex. 2011)). As we previously discussed, Plaintiffs failed to plead that they used diligence in trying to discover Quest and Phadia's civil conspiracy. We thus affirm the district court's dismissal of Plaintiffs' civil conspiracy claim.

### 3. Tortious Interference Claims

The district court also dismissed Plaintiffs' tortious interference claim as time barred. Plaintiffs argue that this claim is subject to the discovery rule. We disagree.

Tortious interference claims are subject to a two-year statute of limitations under Texas law. *See First Nat'l Bank of Eagle Pass v. Levine*, 721 S.W.2d 287, 289 (Tex. 1986). Plaintiffs allege that Quest and Phadia's work convincing UAS's customers to stop using UAS interfered with its existing and future business.

Plaintiffs alleged injuries of lost revenue and lost business relationships. The lost revenue injury is not inherently undiscoverable as discussed above. While the loss of prospective business relationships might be the kind of injury that is inherently undiscoverable, Plaintiffs fail to adequately plead tortious interference with a prospective business relationship. Their complaint does not adequately allege that there was a reasonable probability that UAS and third parties would enter into future

relationships. *See Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 634 (5th Cir. 2002). Though the complaint says that there was a reasonable probability that AAPC would have entered into additional relationships with third parties, the statement is conclusory. Plaintiffs did not plead adequate factual support for their claim, so we dismiss the claim under Rule 12(b)(6).

Accordingly, we affirm the district court's dismissal of Plaintiffs' tortious interference claim.

### C. Leave to Amend Complaint

After the district court dismissed their first complaint, Plaintiffs filed a motion for leave to amend their complaint. The district court denied Plaintiffs' request, and they now argue that the district court erred. We disagree.

Rule 15(a)(2) constrains the district court's discretion in deciding whether to allow parties leave to amend. *See Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 597–98 (5th Cir. 1981). Rule 15 favors granting leave to amend, but denying leave is justified when the movant unduly delays or acts with bad faith or dilatory motive. *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 864 (5th Cir. 2003).

Here, Quest filed its Rule 12(b)(6) motion to dismiss on March 9, 2018. The district court granted Quest's motion on February 22, 2019. In the eleven months that Quest's motion was pending, Plaintiffs did not seek leave to amend their complaint. However, Plaintiffs did timely move for leave to file an amended complaint after the district court issued its order granting dismissal. Their motion did not attach an amended complaint but attached additional evidence instead.

The facts of this case resemble *Whitaker v. City of Houston*, 963 F.2d 831 (5th Cir. 1992). When parties delay seeking leave to amend for several

months after a motion to dismiss is filed, we have held that district courts do not abuse their discretion in denying the request for leave. *See id.* at 837 (affirming district court's denial of Rule 15(a) request to amend for undue delay when the plaintiff did not seek leave to amend for eleven months while motion to dismiss was pending).

Plaintiffs rely on *Dussouy*, where we held that a court can abuse its discretion by denying a request for leave that occurs within a reasonable time after the entry of dismissal. *Dussouy*, 660 F.2d at 599. Though Plaintiffs' request was within thirty days of the district court's entry of dismissal, we cannot conclude that the court abused its discretion because Plaintiffs did not seek to amend during the eleven months that Quest's motion was pending or provide an amended complaint once they did move for leave to amend.

We thus affirm the district court's denial of Plaintiffs' request for leave to amend their complaint.

## IV. Conclusion

For the aforementioned reasons, we AFFIRM in part and REVERSE and REMAND in part.