United States Court of Appeals
Fifth Circuit

**F I L E D**

**December 3, 2003**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 02-20843
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

THERM-ALL, INC., and
SUPREME INSULATION, INC.,

Defendants-Appellants.

_____

Appeals from the United States District Court
For the Southern District of Texas

_____

Before REAVLEY, JONES, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge.

This case concerns an alleged price-fixing agreement between two fiberglass insulation companies, Therm-All, Inc. ("Therm-All") and Supreme Insulation, Inc. ("Supreme"). The issues on appeal are whether the government must prove that a defendant committed an overt act during the statute of limitations period in order to prove that a price-fixing agreement existed during that time, and if so, whether in the instant case the Government introduced evidence sufficient to prove such an overt act beyond a reasonable doubt. Because we hold that the government must prove such an act, and that here, the Government failed to do so, we reverse, vacate, and remand.

1

## I.  FACTS AND PROCEEDINGS

Therm-All and Supreme (collectively, the "Defendants") sell laminated fiberglass insulation to metal building manufacturers and contractors for use in metal buildings.  During the 1990's, five companies, Therm-All, Supreme, Bay Insulation Supply Company ("Bay"), Mizell Brothers Company ("Mizell"), and CGI Silvercote ("CGI"), dominated the metal building insulation industry.  In January 1994, the President of Therm-All, Robert Smigel ("Smigel"), allegedly agreed with the national sales manager for Mizell, Wally Rhodes ("Rhodes"), the President of Supreme, Tula Thompson ("Thompson"), and the sales manager of Bay, Mark Maloof ("Maloof") to increase product prices.  Soon thereafter, CGI allegedly joined the agreement.  The conspirators set prices within a marginal bracket, taking care not to set prices at the exact same level.  No sales person was permitted to deviate from the prices as set forth on pricing sheets that the companies shared.

Therm-All, Smigel, Supreme, and Thompson were indicted on May 31, 2000 for conspiring to fix prices in violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1).  A seven-week trial ensued.  During the trial, the Government introduced convincing evidence regarding the factual allegation that a price-fixing agreement existed from January 1994 to May 1995.  Specifically, the Government showed that four significant price increases occurred within the industry in February 1994, July 1994, December 1994, and March 1995.  In an apparent attempt to show that the conspiracy continued into June 1995, the Government produced testimony from a manager for Bay, Janne Smith ("Smith").  Smith stated that she "guessed" the conspiracy lasted until June 1995.  Smith also stated that in June 1995, Maloof instructed her to lie to the grand jury regarding the price-fixing agreement.  Similarly, Rhodes testified that the conspiracy lasted until June 1995, and that in June 1995, after receiving a grand jury subpoena, he instructed a plant manager to conceal documents

which could implicate the manager.

The jury acquitted Smigel and Thompson, but found Therm-All and Supreme guilty. Therm-All and Supreme filed motions for judgment of acquittal and new trial, but the district court denied those motions. Thermal-All and Supreme timely appeal.

## II. STANDARD OF REVIEW

This Court reviews *de novo* the denial of an appellant's motion for acquittal. *United States v. Medina*, 161 F.3d 867, 872 (5th Cir. 2002). A motion for a judgment of acquittal challenges the sufficiency of the evidence to convict. *See* FED. R. CRIM. P. 29(a). In ruling on the motion for acquittal, this Court reviews the evidence, all reasonable inferences drawn from it, and all credibility determinations in the light most favorable to the Government. *Glasser v. United States,* 315 U.S. 60, 80 (1942); *Medina*, 161 F.3d at 872. This Court reviews the denial of a motion for new trial for abuse of discretion. *Miss. Chem. Corp. v. Dresser-Rand Co.*, 287 F.3d 359, 365 (5th Cir. 2002). This Court upholds a jury verdict if "a rational trier of fact could have found that the evidence established the essential elements of the offense beyond a reasonable doubt." *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996).

## III. DISCUSSION

The central issue in this case is whether the Government has produced any evidence of a Section 1 violation of the Sherman Act which was committed within the applicable statute of limitations period. According to 18 U.S.C § 3282, the government must prove that a defendant committed an offense within five years prior to a grand jury's indictment. Here, the grand jury indicted the Defendants on May 31, 2000, so the Government must produce evidence showing that a price-fixing agreement existed subsequent to May 31, 1995.

A.  Legal basis for requiring an overt act

In most crimes of conspiracy, the government must show an overt act in furtherance of the conspiracy.  *See, e.g., Grunewald v. United States*, 353 U.S. 391, 396-97 (1957) (requiring an overt act in furtherance of a conspiracy to defraud the United States through tax evasion); *United States v. Manges*, 110 F.3d 1162, 1169 (5th Cir. 1997) (holding that the government must show an overt act in furtherance of a conspiracy to defraud the United States through mail fraud); *United States v. Girard*, 744 F.2d 1170, 1172 (5th Cir. 1984) (recognizing the necessity of the government's burden to show an overt act in furtherance of a conspiracy to defraud the United States through bid rigging). The Defendants rely on the overt act requirement of these cases to argue that the Government must prove that the Defendants committed an overt act in furtherance of the price-fixing conspiracy during the statute of limitations.  The Defendants assert that the Government has not presented evidence of any overt act in furtherance of the conspiratorial agreement.

The Defendants's argument is misstated in the context of a Section 1 violation of the Sherman Act.  Section 1 does not require proof of an overt act *in furtherance* of the conspiracy.  *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (citing *Nash v. United States*, 229 U.S. 373, 378 (1913)).  "The heart of a Section 1 violation is the agreement to restrain; no overt act, no actual implementation of the agreement is necessary to constitute an offense."  *United States v. Flom*, 558 F.2d 1179, 1183 (5th Cir. 1977); *accord United States v. Tarpon Springs Sponge Exch.*, 142 F.2d 125, 126 (5th Cir. 1944) (holding that an overt act is not necessary to consummate a conspiracy to restrain trade).  Under Section 1, the price-fixing agreement itself constitutes the conspiracy crime. *Socony-Vacuum*, 310 U.S. at 224 n.59; *Flom*, 558 F.2d at 1183.  Thus, the Government need not prove an overt act *in furtherance* of the price-fixing conspiracy.

4

Nevertheless, because the price-fixing agreement itself constitutes the crime, the Government must still show that the agreement *existed* within the statute of limitations time period. *See United States v. Hayter Oil Co.*, 51 F.3d 1265, 1270 (6th Cir. 1995). Failing to require the Government to show that the conspiracy existed during the statute of limitations period would create a presumption that the price-fixing conspiracy continued throughout that period. This would effectively extend the statute of limitations indefinitely, thereby obviating the statute of limitations requirement. To avoid such an outcome, the Government must offer sufficient evidence that the price-fixing agreement continued to exist within the limitations period.

The Government attempts to infer the agreement's continued existence from the fact that prices remained at the same level a month after the last overt act occurred. This inference is doubtful. Merely showing that prices remain at a specific level does not prove beyond a reasonable doubt that a price-fixing conspiracy continues to exist. Prices are not perfectly elastic. Products usually have inelastic costs of production such that an immediate increase in output is not feasible. If a conspiracy ceases to exist, prices would not immediately decrease because output must at least temporarily remain the same. Thus, prices may remain unchanged a short time after the last act of conspiracy merely because of a product's price elasticity. Inferring a conspiracy based on the fact that prices remain unchanged shortly after the last overt act is therefore problematic.

Even if the Government could prove that prices remained at a raised level for a longer period than is necessary according to the price elasticity for laminated fiberglass insulation,[1] inferring that a conspiracy extends into the statute of limitations is still problematic. Products differ with respect

---

[1] Demonstrating a product's price elasticity would be extremely difficult given the myriad of market factors that affect any product's supply and demand curves.

to their specific price elasticities. Were this Court to allow an inference of conspiracy based on a particular product's price elasticity, this Court would effectively create a different statute of limitations for every individual product. Furthermore, exogenous market variables that are wholly independent from a price-fixing agreement may affect the supply or demand levels even while such an agreement is in effect. In such circumstances, prices would be permanently changed from their original level independent of the agreement. If the price-fixing agreement were to cease, prices would not return to their prior level, and could remain at the same level as under the agreement. Consequently, the fact that prices remain at a specific level could simply indicate a natural market behavior. The Government must do more than show that a few prices correspond with a level set prior to the limitations period in order to show the continued existence of a price-fixing agreement.

To show the continued existence of a price-fixing conspiracy, the Government must show an overt act of, or in furtherance of, the alleged conspiracy. The Supreme Court has stated that while Section 1 does not require showing an act in furtherance of the conspiracy, the act of conspiring is itself a condition of liability. *Nash*, 229 U.S. at 378. Thus, to prove a conspiracy during a certain time period, the Government must produce evidence of an overt act that implies the existence of the alleged conspiracy during that time, regardless of whether the act be in furtherance of or an actual part of the conspiracy.

This standard is consistent with the holdings that our sister circuits have applied in similar cases. In *Hayter Oil Company*, the Sixth Circuit upheld a jury verdict that found the defendants guilty of conspiring to fix prices prior to the statute of limitations. 51 F.3d at 1265. While the court acknowledged that Section 1 did not require proof of an overt act, the court still required the

6

government to show that an agreement existed within the statute of limitations period.[2]  *Id.* at 1270.

The government did so by producing phone records and testimony showing that within the limitations

period, a conspirator repeatedly telephoned another conspirator to discuss increasing prices.  *Id.* at

1271.  Of particular significance was the fact that the testimony specifically detailed the conspiratorial

subject matter of the telephone conversations.  *Id.*

Likewise, in *United States v. Brown*, the Ninth Circuit ruled that a district court correctly

stated the law when the court instructed the jury both (1) that the government did not need to show

an overt act in furtherance of a price-fixing conspiracy, and (2) that the government must show an

overt act in order to establish that the price-fixing conspiracy existed within the statute of limitations

period.  936 F.2d 1042, 1048 (9th Cir. 1990).[3]

This Court's holding in another conspiracy context also implies that an overt act is necessary

to show the continued existence of a price-fixing conspiracy within the statute of limitations.  In

[2] In dictum, the court attempted to bolster its position that the government produced sufficient evidence to show the continued existence of a conspiracy within the limitations period by stating that a conspiracy "is presumed to continue until there is an affirmative showing that it has been abandoned."  *Hayter Oil*, 51 F.3d at 1270-71.  However, this statement seems incorrect in the context of proving that a conspiracy exists within the limitations period.  The presumption of a continuing conspiracy seems limited to inferring a price-fixing agreement once an agreement has already been established within the limitations period.  *See United States v. Kissel*, 218 U.S. 601, 608 (1910).  Indeed, the court's analysis in *Hayter Oil* seems to support this conclusion, despite the cited statement.  The court examined whether the government had produced sufficient evidence to show the conspiracy's continued existence.  *Hayter Oil*, 51 F.3d at 1271.  Yet had the cited statement been correct, the court should have examined whether the *defendants* had produced any evidence that they had abandoned the price-fixing agreement.  Thus, the court's analysis of the facts strongly suggests that the reason the court held that the price-fixing agreement existed within the limitations period was because evidence of conspiratorial overt acts existed.  *Id.*

[3] While the Ninth Circuit reached this conclusion under plain error review, the court nevertheless explicitly stated that "the law was correctly stated."  *Brown*, 936 F.2d at 1048.

7

*United States v. Girard*, this Court determined that because of an overt act, a conspiracy to defraud the United States extended into the limitations period. 744 F.2d 1170, 1173 (5th Cir. 1984). There, a plumbing company allegedly rigged the bidding process for a contract with the city housing authority before the five-year statute of limitations period had begun to run. *Id.* at 1171. The housing authority then paid the plumbing company for its contract services after the limitations period commenced. *Id.* This Court reasoned that the fulfillment of the conspiracy objective to earn profits under the contract was sufficient to show that the conspiracy itself existed within the statute of limitations. *Id.* at 1173. Pivotal to this conclusion was the fact that the incriminating economic benefit was a clear product of the conspiracy. *Id.* The plumbing company's overt act of accepting and retaining payment therefore extended the conspiracy into the statute of limitations period. *Id.*

The following factors thus support the conclusion that the government must show an overt act in the limitations period: (1) *Nash's* recognition of the necessity of an act in a price-fixing conspiracy; (2) the Sixth and Ninth Circuits's holdings in the same context; and (3) this Court's holding in an analogous context. We therefore hold that where a party has entered into a conspiracy in violation of Section 1, but has done so prior to the statute of limitations period, the government must show that during the limitations period, the defendant either committed an overt act of conspiring activity, or alternatively, committed an overt act in furtherance of the conspiracy.

B. Sufficiency of the Government's evidence of an overt act

The Government failed to offer evidence of any overt act supporting the inference that the conspiracy continued to exist after May 31, 1995. The five pieces of evidence that it did offer into evidence fall short of satisfying this requirement. A summation of this evidence follows.

8

First, the Government offered conclusory testimony. Rhodes opined that the agreement lasted until June 1995; Smith testified that she "guessed" the agreement lasted until subpoenas were issued in June 1995. But neither Rhodes nor Smith testified about any acts occurring after May 31, 1995 to substantiate their opinions. Neither witness's testimony offers evidence of any overt act within the statute of limitations.

Second, the Government attempts to show an overt act by introducing testimony that a Therm-All employee, Mr. Engebretson, transmitted a facsimile to an employee of CGI in June 1995. This evidence is inconclusive. "When the government attempts to prove the existence of a conspiracy by circumstantial evidence, each link in the inferential chain must be clearly proven." *United States v. Galvan*, 693 F.2d 417, 419 (5th Cir. 1982). Based on this principle, this Court has stated that "telephone records are *insufficient* evidence to support a conspiracy conviction unless the government can show who participated in the calls *and the substance of their conversation*." *United States v. Williams*, 264 F.3d 561, 574 (5th Cir. 2001) (emphasis added). In *Galvan*, this Court determined that evidence of telephone conversations between conspirators was not, by itself, sufficient to prove that the conspirators discussed the criminal activity. 693 F.2d at 419. In the instant case, Mr. Engebretson simply testified that a facsimile transmission occurred. No evidence suggested that the subject of the facsimile concerned product pricing. While the transmission was certainly an overt act, the Government did not demonstrate that the act was in any way relevant to the alleged conspiracy. In accordance with *Galvan* and *Williams*, the record of the facsimile transmission is insufficient to prove the existence of the alleged conspiracy.

Third, the Government offered invoices dated in June 1995 from four of the conspiring companies. The prices listed on the invoices corresponded with the pricing sheets that were

9

conspiratorially promulgated prior to May 31, 1995. The Government claims that these invoices show that the conspirators were realizing an economic benefit of the conspiracy within the statute of limitations time period. Relying on *Girard*, the Government argues that the realization of this economic benefit establishes that the conspiracy existed within the relevant time period.

Although the Government is correct that realization of an economic benefit can show the existence of a conspiracy within the limitations period, the economic benefit must nonetheless be clearly tied to the conspiracy. In *Girard,* the sole reason that the conspirators received the contract benefit was because of the conspiracy. 744 F.2d at 1172-73. Here, however, the economic benefit stated on the invoices cannot clearly be tied to the Defendants' former price-fixing agreement. The Government produced only 90 invoices from all four companies' combined records to prove that a price-fixing agreement continued into June 1995.[4] These invoices constituted only five percent of sales during that time. Five percent of sales correspo nding with the prior agreement is hardly sufficient to infer the agreement's continued existence. This evidence does not demonstrate that the companies were at that point developing, carrying out, or reaping the fruit of the prior agreement. Indeed, the dearth of corresponding prices strongly suggests that the agreement no longer existed. It seems eminently likely that more than five percent of sales would have reflected conspiratorial behavior had the companies continued pricing according to the agreed-upon marginal brackets.

It is also noteworthy that the Government did not produce the invoices at trial to prove price-fixing within the limitations period. The Defendants stipulated to the invoices for the sole purpose of showing interstate commerce activity. As an afterthought on appeal, the Government relies on the

---

[4] Ironically, the Government did not provide this Court with the invoices that did not correspond to the price-fixing sheets because of the burden that such a "voluminous exhibit" would create.

invoices to argue a point outside the scope of the stipulation. This fact, combined with the blatant absence of corresponding prices, is more than sufficient to conclude that the 90 invoices fail to prove *beyond a reasonable doubt* that the conspiracy existed during the limitations period.

Fourth, the Government produced evidence that Maloof and Rhodes attempted to conceal the conspiracy in June 1995. Specifically, Smith testified that in June 1995, Maloof instructed Smith not to tell the grand jury that the companies had ever entered a price-fixing agreement. At about the same time, Rhodes testified that after receiving a grand jury subpoena, he told a plant manager to conceal documents which could implicate the manager. The Government contends that these acts of concealment show that the conspiracy existed in June 1995.

Acts of concealment may constitute overt acts indicating the existence of a conspiracy. *Grunewald*, 353 U.S. at 405. Such acts must be "done in furtherance of the main criminal objectives of the conspiracy" rather than those done "for the purpose only of covering up after the crime." *Id.* This Court has applied this principle in *United States v. Mann*, 161 F.3d 840, 859 (5th Cir. 1998). In *Mann*, this Court held that an act of concealment evinced an overt act for limitations purposes because "[t]he central aim of the conspiracy extended to concealing the fraudulent nature of the transaction." *Id.* There, the indictment alleged a conspiracy to "hide and keep concealed . . . true facts and circumstances surrounding the acquisition, financing, operation, and management of [a financial institution]; [and] to hinder and defeat the [IRS] in the ascertainment . . . of income tax . . . ." *Id.* "[T]he purpose of the main conspiracy . . . by its very nature, called for concealment." *Id.* Furthermore, this Court held that to be an overt act, statements of concealment must be "made solely to aid the concealment . . . [,] made during and in furtherance of the charged conspiracy." *Id.*

In the instant case, at the outset of a price-fixing conspiracy, conspirators do not contemplate

making such statements of concealment as those which Maloof and Rhodes made. Their statements instructing others to lie to a grand jury and to conceal conspiratorial documents do not fulfill the main purpose of a price-fixing agreement—to raise and maintain prices. Indeed, their statements seem to cover up the main conspiracy, indicating "nothing more than that the conspirators [did] not wish to be apprehended—a concomitant, certainly, of every crime . . . ." *Grunewald*, 353 U.S. at 406. The statements do not show the continued existence of a price-fixing conspiracy.

Fifth, the Government offers tape-recorded conversations of May 4, 2003 and May 5, 2003 showing that the conspiracy was effective on those dates. It also offers testimony of a Mizell salesman that he submitted a bid on May 15, 2003 which was based on a conspiracy pricing sheet. This evidence is highly persuasive that the conspiracy existed up through May 15, 1995. It is impotent in showing that the conspiracy existed past May 31, 1995. The Government thus fails to produce evidence of an overt act occurring after the critical limitations date.

## IV. CONCLUSION

Because the Government failed to provide evidence that the conspiracy existed beyond May 31, 1995, the district court should have granted the Defendants's motion for acquittal. We therefore REVERSE and VACATE the judgment, and remand for a ruling not inconsistent with this holding.

REAVLEY, Circuit Judge, dissenting:

I respectfully dissent. The jury was instructed that the government had to prove "that the conspiracy charged in the indictment continued after May 31, 1995," and that it could so find "only if the government has proven that some action was taken by a conspirator in furtherance of the conspiracy after that date." I do not understand the majority or appellants to find any fault with the court's instructions relevant to limitations, and I would hold that a rational jury could have found beyond a reasonable doubt that action in furtherance of the conspiracy occurred after May 31, 1995.

In the case of a price-fixing agreement, the exchange of pricing information by the conspirators, and the charging to customers of artificially inflated prices made possible by the conspirators' illegal collusion, constitute acts in furtherance of the conspiracy. This jury could find that such overt acts in furtherance of the conspiracy did occur within the limitations period.

The government proved a highly successful conspiracy to fix prices for an essentially fungible product sold by appellees and other conspirators. The agreement made possible a series of price increases above the prices that would have prevailed in a competitive environment, as evidenced by proof that prices and profit margins rose significantly after the agreement was reached, and prices dropped significantly after the government issued subpoenas to the conspirators. It is logical to believe that the conspirators, once having decided to break the law for financial gain, would continue to charge illegally fixed prices until they were caught. Hence, the Sixth Circuit has stated that "once a conspiracy has been established, it is presumed to continue until there is an affirmative showing that it has been abandoned." United States v. Hayter Oil, Inc., 51 F.3d 1265, 1270-71 (6th Cir. 1995). Even if the law of our circuit does not presume as a matter of law, for limitations purposes, that a

price-fixing conspiracy continues until the participants are caught, and even if the jury in the pending case was not so instructed, the jury could have reasoned that the participants would have no reason to abandon their profitable conspiracy until such time. Indeed, the conspirators managed three rounds of coordinated price increases in 1994, and a separate price increase for unfaced insulation in 1995. They apparently had no interest in voluntarily abandoning their illegal pact and returning to a competitive market.

The jury heard evidence that (1) the conspirators entered into a horizontal price-fixing agreement, the most blatant of Sherman Act violations; (2) the conspirators engaged in an extensive, organized effort to maintain the agreement by exchanging ongoing pricing information, and to conceal the agreement by charging slightly different prices; (3) the agreement was successful at raising prices and profits for the conspirators; (4) in June 1995 the conspirators continued to charge customers pursuant to price lists agreed upon under the price-fixing agreement, as evidenced by numerous examples of invoices and corresponding price lists admitted at trial; (5) prices dropped after the issuance of subpoenas in June of 1995, and had "dropped dramatically" according to one witness by the time of trial; (6) Mark Engebretson of Therm-All was an active participant in the conspiracy, was involved in the exchange of pricing information and fixing of prices, had talked to Roger Ferry of CGI about pricing, and had communicated with Ferry by fax and phone into June 1995, although the contents of the June 1995 communications were not explicitly revealed at trial; (7) when asked when the price-fixing agreement ended, Jaane Smith of Bay, the whistleblower, testified, "I guess after people started getting served subpoenas" in June of 1995, and later testified, with respect to what was "happening in the marketplace" after the subpoenas issued, that "[t]hings started returning to how they were before and things started becoming more competitive again;" and (8) Huber Rhodes, a

14

Mizell vice president, active participant in the conspiracy, and key government witness, testified that the price-fixing agreement continued until June of 1995, "when the FBI came in Mizell Brothers with a subpoena from the Justice Department." This evidence was sufficient to prove that overt acts in furtherance of the conspiracy, especially the continued charging of agreed, artificially high prices to customers, as well as the continued exchange of pricing information, occurred within the limitations period.