United States Court of Appeals
Fifth Circuit

**F I L E D**

June 14, 2004

Charles R. Fulbruge III
Clerk

**REVISED AUGUST 10, 2004**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 02-20843

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

THERM-ALL, INC., and
SUPREME INSULATION, INC.,

Defendants-Appellants.

_____

Appeals from the United States District Court
For the Southern District of Texas

_____

ON PETITION FOR REHEARING EN BANC

(Opinion December 3, 2003, 5th Cir. 2003, ____F.3d____)

Before REAVLEY, JONES, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge.

Upon reconsideration, we withdraw our previous opinion, reported at 352 F.3d 924, and

substitute the following.[1]

After a seven-week trial, a jury convicted Therm-All, Inc. ("Therm-All") and Supreme

---

[1] No member of the panel nor judge in regular active service of the Court having requested that the Court be polled on Rehearing En Banc (FED. R. APP. P. and 5th CIR. R. 35), the Petition for Rehearing En Banc is denied.

1

Insulation, Inc. ("Supreme") of conspiring to fix prices in the building insulation industry, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Therm-All and Supreme (collectively "Defendants") raise the following six issues on appeal: (1) whether sufficient evidence supports the jury finding that a conspiracy existed; (2) whether the Government produced evidence that the conspiracy existed during the statute of limitations period; (3) whether a fatal variance existed between the indictment and the proof at trial; (4) whether the district court improperly instructed the jury; (5) whether the district court should have ordered a new trial based on prosecutorial misconduct; and (6) whether a discovery error by the Government rises to the level of plain error. We conclude that the Defendants do not prevail on any of these issues, so we affirm the judgment.

## I. FACTS AND PROCEEDINGS

During the 1990's, five companies, Therm-All, Supreme, Bay Insulation Supply Company ("Bay Insulation"), Mizell Brothers Company ("Mizell Co."), and CGI Silvercote ("CGI"), dominated the market for laminated fiberglass. These companies laminated fiberglass so that it could be used to insulate metal buildings. In 1992 and 1993, the metal-building industry expanded dramatically, and consequently, prices of metal-building insulation plummeted. In late 1993, the fiberglass manufacturers—suppliers for the five fiberglass laminating companies listed above—announced a price increase and an "allocation" system under which they would be producing more residential and less metal building insulation.

At trial, the Government presented evidence that during the fiberglass manufacturer's allocation period, the five laminating companies acted in the following manner to bring about a conspiratorial agreement. In October 1993, during a convention in Dallas, Texas, the laminating companies discussed forming a committee to establish product and safety standards for metal building

2

insulation. Subsequently, the president of Therm-All, Robert Smigel ("Smigel"), telephoned the national sales manager for Mizell Co., Wally Rhodes ("Rhodes"), to discuss whether Mizell Co. had any interest in supporting this committee. Near the end of their conversation, Smigel (of Therm-All) mentioned the prevailing low prices in the industry, and characterized the situation as "a dog-eat-dog market." Smigel said he thought Bay Insulation, which was expanding into many new areas at the time, was responsible for the low prices, and Rhodes (of Mizell Co.) agreed. Smigel then said that he had agreed with the sales manager of Bay Insulation, Mark Maloof ("Maloof"), to increase and maintain prices. This would be accomplished, Smigel explained, by publishing price sheets with nearly identical prices, and "selling . . . on the price sheet, not coming below the price sheet and not jumping the brackets." Rhodes "immediately" agreed that Mizell Co. would do the same. In January 1994, Rhodes had similar conversations with Maloof (of Bay Insulation) and with the president of Supreme, Tula Thompson ("Thompson"), in which they agreed to raise prices, use bracket pricing, and not deviate from the price sheets. Thus, by January 1994, Smigel, Thompson, Maloof, and Rhodes had reached an agreement "to get the pricing up in the industry and make more money." Smigel then brought CGI into the conspiracy, as well as smaller regional competitors.[2]

The conspirators faxed each other price sheets, and spoke on the phone "to get the pricing in line with each other . . . within a couple of dollars of each other in each [pricing] bracket," trying not to use the "exact" same prices so that customers would not get suspicious. For example, Rhodes (of Mizell Co.) received a copy of Therm-All's February 14, 1994 price sheet from Smigel's Therm-All office in January 1994, at which time Rhodes was working on Mizell Co.'s prices. Rhodes then

---

[2] Witness Peter Yueh provided evidence of a smaller regional competitor joining the conspiracy. Yueh was a former vice president of a company that sold laminated fiberglass primarily in Texas; he testified that his former company became part of the conspiracy in January 1994.

"tried [his] best to get the numbers as close as [he] could . . . to [Therm-All's] numbers without being identical in every bracket." When he finished, Rhodes faxed Mizell Co.'s draft price sheet to Smigel a few days before it became effective.

Another example of conspiratorial conduct allegedly occurred when Rhodes (of Mizell Co.) told Leif Nilson, Mizell Co.'s California plant manager, that he had an agreement with Thompson (of Supreme) to keep the California prices up, and therefore, they were to stick to the price sheets. On one occasion, Rhodes faxed Nilsen "Supreme's price sheet" containing a Supreme fax header.

Several witnesses explained how the various companies policed and enforced the agreement. Rhodes (of Mizell Co.) testified that when a conspirator believed another conspirator was offering too low a price to a mutual customer, the conspirator could call Rhodes and verify the complaint or obtain an explanation. Rhodes provided an example of this conduct, stating that Smigel (of Therm-All) called him several times in 1994 complaining that a Mizell Co. salesperson in Pennsylvania had jumped a bracket. Nilsen (of Mizell Co.) also called Rhodes whenever he believed that Supreme was pricing below the agreed-upon level. Rhodes responded to Nilsen that he would "call and see what was going on," and then called back to say that he had discussed the incident with Supreme and that it would not happen again.

Evidence also existed that Supreme called co-conspirators when it suspected they were not complying with the agreement. Supreme's California salesman, Jim Miranda ("Miranda"), told his plant manager that, according to a customer, Supreme's quote to that customer was higher than Mizell Co.'s quote. The plant manager relayed this information to Thompson (of Supreme), who called Rhodes (of Mizell Co.), who told Thompson that the customer must have been "pulling [Miranda's] leg."

The following evidence is also noteworthy for purposes of this appeal. First, Miranda provided testimony at trial (1) that Thompson (of Supreme) obtained a price sheet from Rhodes (of Mizell Co.), and (2) that Miranda (of Supreme) himself had told this information to the grand jury. Second, Rhodes (of Mizell Co.) testified that the conspiracy continued through June 1995. Third, Mark Engebretson ("Engebretson"), a Therm-All employee, testified that he had conversations with Roger Ferry ("Ferry"), a CGI employee, about pricing information. The telephone records of Engebretson (of Therm-All) revealed that on June 8, 1995, he had a short conversation with Ferry (of CGI), and sent Ferry a fax on June 15, 1995. Fourth, Rhodes (of Mizell Co.) testified that a price sheet that CGI had in its possession contained the handwriting of a Therm-All vice president, Dennis Kaczmarek ("Kaczmarek"), on it.

The jury acquitted Smigel (of Therm-All) and Thompson (of Supreme), but found Therm-All and Supreme guilty. Therm-All and Supreme filed motions for judgment of acquittal and new trial, but the district court denied those motions. Thermal-All and Supreme timely appeal.

## II. STANDARD OF REVIEW

This Court reviews de novo the denial of an appellant's motion for acquittal. *United States v. Medina*, 161 F.3d 867, 872 (5th Cir. 2002). A motion for a judgment of acquittal challenges the sufficiency of the evidence to convict. *See* FED. R. CRIM. P. 29(a). In ruling on the motion for acquittal, this Court reviews the evidence, all reasonable inferences drawn from it, and all credibility determinations in the light most favorable to the Government. *Glasser v. United States,* 315 U.S. 60, 80 (1942); *Medina*, 161 F.3d at 872.

This Court reviews the denial of a motion for new trial for abuse of discretion. *Miss. Chem. Corp. v. Dresser-Rand Co.*, 287 F.3d 359, 365 (5th Cir. 2002). This Court will uphold a jury verdict

5

if "a rational trier of fact could have found that the evidence established the essential elements of the offense beyond a reasonable doubt." *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996).

### III.  DISCUSSION

Defendants raise six issues on appeal.  The first is whether the Government produced sufficient evidence to show that a conspiracy existed.  The second is whether evidence exists that the alleged conspiracy continued during the limitations period.  The third is whether a fatal variance exists between the indictment and the proof at trial.  The fourth is whether the district court improperly instructed the jury.  The fifth is whether the district court should have ordered a new trial based on the Government's closing argument.  The sixth is whether a discovery error by the Government rises to the level of plain error.  We address each in turn.

### A.  Sufficiency of the evidence

Defendants first argue that the evidence does not support the jury verdicts against them because the jury did not convict Thompson (of Supreme), Rhodes (of Mizell Co.), or Smigel (of Therm-All) of illegal activity.  This argument fails.  In *United States v. Cargo Service Stations, Inc.,* 657 F.2d 676, 684-85 (5th Cir. 1981), this Court faced the same issue.  There, the Government alleged that several companies and their agents violated Section 1 of the Sherman Act.  *Id.*  The jury convicted the companies but acquitted their agents.  *Id.* at 684-85.  On appeal, the companies argued that the evidence did not support their convictions because every person who could have acted as their agent had been acquitted.  *Id.*  This Court rejected that argument, stating:

> In this Circuit consistency is not required.  That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible.  But verdicts cannot be upset by speculation or inquiry into such matters.  As the Supreme Court explained in a similar case in which the corporation was acquitted and the individual was convicted, "whether the jury's verdict was a result of carelessness or compromise

6

or a belief that the responsible individual should suffer the penalty instead of merely increasing, as it were, the cost of running the business of the corporation, is immaterial. Juries may indulge in precisely such motives or vagaries." *United States v. Dotterweich*, 320 U.S. 277, 279 (1943).

*Id.* at 685 (internal citations and quotations omitted). Thus, because a consistency of verdicts is not necessary to convict a corporation, the Defendants' argument fails.

Defendants next contend that they could not have been guilty of conspiring to fix prices because circumstantial evidence demonstrates otherwise. Specifically, Therm-All cites evidence that its price increases were correlated with the fiberglass manufacturers' allocation period; Supreme cites evidence that it increased sales during that period and took customers away from Mizell Co. and Bay Insulation. This evidence, however, does not compel the conclusion that Therm-All and Supreme could not have engaged in price-fixing activity. The jury could reasonably infer that despite market conditions affecting the price, and despite competitive activity, the companies conspired to raise the aggregate prices of their goods. Indeed, direct testimony supports such an inference.[3] The Defendants' circumstantial evidence thus falls well short of establishing that the jury verdict was an unreasonable one.

## B. Statute of limitations

The Defendants argue that the Government failed to produce any evidence that the conspiracy occurred within the applicable statute of limitations period. The Government counters this argument by contending that antitrust law does not require that it produce any evidence of the conspiracy's continued existence during the limitations period because Defendants failed to make a showing of abandonment. For the reasons discussed below, we hold that in a price-fixing conspiracy, the

---

[3] For this same reason, we also reject Supreme's brief argument that the verdict is against the great weight of the evidence.

7

government must produce evidence of the conspiracy's continued existence during the limitations period. We further hold that in this instance, the Government has satisfied that burden.

**(1) Whether the Government was required to prove the conspiracy's existence in the limitations period**

The question of whether the government must produce evidence that a price-fixing conspiracy continued to exist during the limitations period is *res nova* for this Court. The issue arises in part from a statement made in a historic antitrust case, *United States v. Kissel,* 218 U.S. 601 (1910). In *Kissel*, the Supreme Court addressed whether the government must prove that a defendant has acted in the limitations period to show that an antitrust conspiracy occurred during that time. 218 U.S. at 601. To answer this question, the Court first discussed the issue of whether a conspiracy was a continuing crime. *Id.* at 607 ("[W]e first will consider whether a conspiracy can have continuance in time."). The defendants asserted that the conspiracy was a completed crime once the participants had formed the agreement—not a continuing crime. *Id.* Based on that assertion, the defendants further argued that despite subsequent acts in furtherance of the agreement (which by themselves were not actionable), the statute of limitations should run from the time of the original agreement. *Id.* The Court rejected this argument, holding that the antitrust conspiracy was indeed a continuing crime. *Id.* at 607-08. The Court reasoned that "if [the defendants] do continue such efforts in the pursuance of the plan, the conspiracy continues up to the time of abandonment or success." *Id.* at 608. This statement, then, was the basis for the Court rejecting the defendants' argument that the subsequent acts were not part of the original act of conspiracy.

The above statement can be interpreted two ways. The first interpretation posits that the conspiracy is presumed to continue indefinitely, whereas the second posits that the conspiracy is

8

presumed to continue up to the point of the last act in furtherance of the conspiracy. Under the first interpretation, once a conspirator has committed an act of continuing effort, the conspiracy would continue indefinitely unless the conspirator made a showing of abandonment or success. The indefinite presumed existence would imply that the conspiracy is indefinitely actionable. The limitations period would always be tolled absent a showing of abandonment or success.

Under the second interpretation, once a conspirator has committed an act of continuing effort, the conspiracy would continue from the point of the original conspiratorial agreement until the last act of continuing effort. That presumption of its continued existence between those two points in time would only be rebutted if the conspirator had made a showing of abandonment or success. In effect, the statute of limitations would reset from that act of continuing effort. The indictment would therefore have to be brought within the applicable limitations period after that act of continuing effort. That is, the government would have to show that the conspirator committed an act of continuing effort within a time period before the date that the indictment was brought.

The facts and reasoning of *Kissel* compel the second interpretation. As previously noted, the Supreme Court stated that a "conspiracy continues up to the time of abandonment or success" in the context of rejecting the defendants claim that an act of continuing effort should not be part of the same actionable conduct as the original conspiratorial agreement. *Kissel*, 218 U.S. at 608. The Court held that the limitations period did not expire from the original conspiratorial act because—as stated in the cited sentence—a presumption exists that the conspiracy continues between the original conspiratorial act and the act of continuing effort (absent a showing of abandonment or success). *Id.* In so holding, the Court relied upon the fact that "[t]he overt acts relied upon [occurred] within three years of the indictment [and were] alleged to have been done in pursuance of the conspiracy . . . ."

9

*Kissel*, 218 U.S. at 609-10.  The Court therefore reasoned that because the overt acts (1) occurred within three years of the indictment (the limitations period), and (2) denoted efforts to carry out the conspiracy, the original antitrust conspiracy continued into that period.[4]  *Id.  Kissel* thus implies that if conspirators commit overt acts in furtherance of a conspiracy, the statute of limitations period resets from the commission of those acts.  The statute of limitations runs from the last overt act.[5] Stated another way, an overt act must occur within a certain time period—as defined in the statute of limitations—prior to the date on which the indictment is brought.

The Supreme Court further clarified this principle in the civil context of a continuing antitrust conspiracy in *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321 (1971).[6]  The Court stated:

> Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business. . . . In the context of a continuing conspiracy to violate the antitrust laws, . . . this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants . . . the statute of limitations runs from the commission of the act.

*Id.* at 338.  Thus, the statute of limitations runs from the commission of each act that is subsequent to the original conspiracy act.  *Id.*  The party bringing the antitrust action must therefore show that

---

[4] Notably, the Court did not rely on the fact that the conspirators had failed to show abandonment or success in concluding that the conspiracy continued to exist.

[5] A leading antitrust treatise supports this understanding of the statute of limitations as it relates to an antitrust conspiracy.  2 HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION 208 (2d ed. 2000).  In explaining continuing antitrust conspiracies, the treatise states that "[t]he idea of the continuing conspiracy or violation is that the defendant continues to commit acts in furtherance of the violation and each of these additional acts causes additional injury.  The statute is said to be tolled as long as such qualifying acts continue to be committed."  *Id.*

[6] Although *Zenith* was a civil suit, the stated principle should also be true in the criminal context because criminal proceedings require a higher burden of proof than civil proceedings.

the conspiracy continued into the limitations period.

## a. Relevant Fifth Circuit precedent

This Court has addressed whether a continuing antitrust conspiracy extends into the statute of limitations period in *Poster Exchange, Inc. v. National Screen Service Corp.*, 517 F.2d 117 (5th Cir. 1975), and again in *Al George, Inc. v. Envirotech Corp.,* 939 F.2d 1271 (5th Cir. 1991). While these cases arose in the civil context, this fact does not distinguish the burden-of-proof principle because civil proceedings require a less stringent burden of proof than criminal. In *Poster Exchange*, this Court considered whether an antitrust conspiracy continued into the limitations period where the defendants, before the limitations period began, allegedly agreed not to sell items to the plaintiff. 517 F.2d at 117. This Court held that to invoke the continuing-conspiracy doctrine, the plaintiffs had to show that "there had been a specific act or word of refusal [by defendants to do business with plaintiff] during the limitations period." *Id.* at 129. Because the summary-judgment record did not make clear that the defendants had committed an act during the limitations period, this Court remanded for further findings. *Id.* at 128-29.

In *Al George,* this Court again considered whether a plaintiff had to show an act within the limitations period to allege an antitrust violation. 939 F.2d at 1273-74. This Court recognized that "'a newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period, *not merely the abatable but unabated inertial consequences of some pre-limitations action*.'" 939 F.2d at 1274 (quoting *Poster Exchange*) (emphasis in *Al George*). Because the plaintiff failed to allege an overt act within the statute of limitations time period, this Court held that the limitations period had run. *Id.* at 1275.

## b. Ninth Circuit persuasive authority

11

In *United States v. Brown,* 936 F.2d 1042 (9th Cir. 1991), the Ninth Circuit faced the same question as this Court does in the instant case. There, the court considered whether a district court provided a correct jury instruction in a criminal price-fixing conspiracy case. *Id.* at 1048. The court held that the district court "correctly stated" the law when the district court instructed the jury both that (1) the government did not need to show an overt act in furtherance of a price-fixing conspiracy, and (2) the government must show an overt act in order to establish that the price-fixing conspiracy existed within the limitations period. *Id.* Thus, the *Brown* decision recognizes that even though the government need not show an overt act in furtherance of a price-fixing conspiracy, the government was still required to show *some* act within the limitations period.

Additional Ninth Circuit precedent further supports the above interpretation of *Kissel.* In *United States v. Inryco, Inc.*, 642 F.2d 290 (9th Cir. 1981), the court interpreted *Kissel* as standing for the following statement of law:

> While a Sherman Act conspiracy is technically ripe when the agreement to restrain competition is formed, it remains actionable until its purpose has been achieved or abandoned, and *the statute of limitations does not run so long as the co-conspirators engage in overt acts* designed to accomplish its objectives. *U. S. v. Kissel*, 218 U.S. 601, 607-608 (1910).

*Id.* at 293 (emphasis added). This passage sets forth the rule of law that the statute of limitations is tolled only if a conspirator engages in overt acts. While the passage also presumes that a conspiracy continues to exist until its purpose has been achieved or abandoned, this statement cannot be construed to mean that this presumed continued existence automatically tolls the statute of limitations. Were the statement read as such, it would render the passage's explicit condition for tolling meaningless. In order for the presumption to continue, there must be an overt act. Absent an overt act, the presumption that a conspiracy remains actionable must end after the limitations

12

period has run from the time of the last overt act. Thus, the passage means that the statute of limitations is tolled only if a conspirator commits an overt act.

## c. Conflicting authority

Despite the apparent clarity of the rule that the government must produce evidence that a price-fixing conspiracy exists during the limitations period, the language of a Sixth Circuit opinion can be construed as holding otherwise.[7] In *United States v. Hayter Oil Co. Inc. of Greenville, Tennessee,* 51 F.3d 1265 (6th Cir. 1995), the Sixth Circuit faced an issue similar to that posed in the instant case. The court explained the limitations law governing price fixing as follows:

> Because the price-fixing agreement itself constitutes the crime, the government is only required to prove that the agreement existed during the statute of limitations period and that the defendant knowingly entered into that agreement. Proof of an overt act taken in furtherance of the conspiracy within the statute of limitations period would clearly demonstrate the continued existence of the conspiracy. *However, once a*

[7] The Government argues that the rationale of a recent Second Circuit opinion, *United States v. Spero*, 331 F.3d 57 (2d Cir. 2003), should control here. We disagree. In *Spero*, the Second Circuit held that a RICO conspiracy would continue, even into the limitations period, until the defendants made an affirmative showing that they had withdrawn. *United States v. Spero*, 331 F.3d at 60-61. As a preliminary matter, this case is two steps removed from the instant case. First, this case occurs in the Second Circuit—not the Fifth. Second, this case arises in the RICO context—not antitrust. The Second Circuit has not actually applied the cited rationale in the context of a price-fixing agreement. For these two reasons, alone, *Spero* is not persuasive. More importantly, the rationale of *Spero* appears to conflict with *Kissel,* and expressly conflicts with *Al George, Poster Exchange, Brown*, and *Inryco.*

Even if precedent did not speak to this issue, *Spero* is not persuasive. "Limitations serve the same functions in anti-trust as elsewhere in the law: to put old liabilities to rest, to relieve courts and parties from 'stale' claims where the best evidence may no longer be available, and to create incentives for those who believe themselves wronged to investigate and bring their claims promptly . . . ." 2 HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION 205 (2d ed. 2000). Adopting the Second Circuit's rule would circumvent the policy underlying the law of limitations. The rule of *Spero* allows the government to bring claims well after any evidence is found to substantiate the original act of conspiracy. It nullifies much of the incentive to bring a claim after the last alleged injurious act because the statute of limitations would only begin running from the time that the defendant made a showing of abandonment. We therefore decline to adopt the Second Circuit's rationale in the context of a price-fixing conspiracy.

> *conspiracy has been established, it is presumed to continue until there is an affirmative showing that it has been abandoned.*

51 F.3d at 1270-71 (citation omitted) (emphasis added). The last sentence of this quotation implies that once a conspiracy has been established, even outside the limitations period, that conspiracy is presumed to continue indefinitely until it has been abandoned. The facts of the case, however, suggest that the court did not rely on this statement of law to show that the agreement continued into the limitations period. The facts consisted of defendants committing multiple acts in furtherance of the price-fixing conspiracy both outside of and within the limitations period. *Id.* at 1271. Specifically, undisputed evidence demonstrated that prior to the limitations period a conspiracy existed; evidence also existed that during the limitations period, the conspirators set prices at an agreed-upon level and made telephone calls discussing prices. *Id.* Based on these alleged events, the court concluded that "[t]here is . . . sufficient evidence in the record that the conspiracy continued past the relevant statute of limitations date." *Id.* Accordingly, the court did not rely solely on the proposition that there is a presumption of a continued conspiracy in holding that the defendants had continued their price-fixing conspiracy during the limitations period. *Id* at 1270-71. The facts and reasoning of *Hayter Oil* do not warrant construing the single cited sentence to be a sufficient reason to presume the continued existence of the conspiracy within the limitations period.

The single sentence in *Hayter Oil* also seems to conflict with the Sixth Circuit's general requirement that the government "is . . . required to *prove* that the agreement existed during the statute of limitations period." 51 F.3d at 1270 (emphasis added). If the cited sentence were to mean that the presumption continues even into the limitations period—regardless of whether the government shows any act during that period—the court would have nullified its prior statement that

14

the government is "required to prove" that the conspiracy existed during that time. Thus, to preserve the meaning of the court's statement regarding the government's burden of proof, it seems necessary to construe the cited sentence regarding the presumption of continued existence as mere support for the court's prior statement that *any* overt act demonstrates the conspiracy's continued existence. In effect, the Sixth Circuit seems to treat the identified presumption as a justification for allowing an overt act—which might otherwise be insufficient to convict for conspiracy—to be sufficient to show that the conspiracy occurred within the limitations period. This reading preserves the meaning of both the statement imposing a burden of proof on the government, and the statement concerning the conspiracy's continued existence. In any event, the *Hayter Oil* court did not rely only on this single sentence to hold that the Government satisfied its burden of proof to show that the conspiracy continued into the limitations period. It would therefore be inappropriate to conclude that the cited presumption satisfies the government's burden "to prove that the agreement existed during the statute of limitations period." *See id.*

Thus, although the Sixth Circuit has possibly espoused a view that appears to mean that a price-fixing conspiracy is presumed to continue into the limitations period, its statement is not persuasive for this Court to presume the conspiracy's continued existence absent any evidence of such. Supreme Court precedent, this Court's precedent, and persuasive authority of the Ninth Circuit lead us to conclude that the government must produce evidence that the conspiracy continued during that time.

**(2) Whether the Government did produce evidence in the limitations period**

Defendants argue that the Government failed to produce evidence demonstrating that the price-fixing conspiracy existed within the limitations period. The argument fails. The limitations

15

period is five years under 18 U.S.C. § 3282, and the grand jury indicted the Defendants on May 31, 2000. Accordingly, the Government was required to produce evidence showing the conspiracy's continued existence after May 31, 1995. The Government did so. Rhodes (of Mizell Co.) testified that the conspiracy continued through June 1995. This testimony is direct evidence that the participants were involved in conspiratorial acts, i.e., the acts of setting prices at agreed-upon levels, during the limitations period. The Defendants' limitations argument is thus unfounded. The jury could have reasonably inferred that the conspiracy continued into the limitations period based on this evidence.

## C. The indictment and the proof at trial

Therm-All argues that a fatal variance exists between the indictment, which alleged a single, nationwide conspiracy, and the proof at trial, which Therm-All claims only established multiple conspiracies.[8] To prevail on this claim, Therm-All must prove "(1) a variance between the indictment and the proof at trial, and (2) that the variance affected the defendant's substantial rights." *United States v. Herrera*, 289 F.3d 311, 318 (5th Cir. 2002). As discussed below, Therm-All fails to prove either point.

## (1) Alleged variance between the indictment and the proof at trial

No fatal variance appears between the indictment and the evidence. The indictment alleges a single, nationwide conspiracy, and the evidence appears to support that allegation. When counting conspiracies, "this Court will consider (1) the existence of a common goal, (2) the nature of the scheme, and (3) overlapping of participants in the various dealings." *United States v. Morgan,* 117 F.3d 849, 858 (5th Cir. 1997). "A jury's finding that the government proved a single conspiracy

---

[8] Supreme does not appeal this point of error.

16

must be affirmed unless the evidence, viewed in the light most favorable to the government, would preclude reasonable jurors from finding a single conspiracy beyond a reasonable doubt." *Id.*

"This [C]ourt has defined the 'common goal' factor used to count conspiracies broadly." *Morgan*, 117 F.3d at 858; *accord United States v. Morris*, 46 F.3d 410, 415 (5th Cir. 1995) (observing that the Fifth Circuit has broadly defined this criterion and has adopted an expansive notion of "common purpose"). In *Morris*, this Court held that the common goal of a single conspiracy was to "to profit from the illicit purchase and selling of cocaine." 46 F.3d at 415. Similarly, the activity at issue here stems from a common goal of deriving illicit profits from the sale of common goods. Direct testimony of Rhodes (of Mizell Co.) and Smigel (of Therm-All) supports the inference that the Defendants had a common goal of raising and maintaining prices.

The nature of the scheme also points to the conclusion that the evidence supports an inference of a single, nationwide conspiracy. This Court has defined the nature-of-the-scheme criterion to mean that "if an agreement contemplates bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators to keep it up, then such agreement constitutes a single conspiracy." *Morris*, 46 F.3d at 415-16 (quoting *United States v. Perez*, 489 F.2d 51, 62 (5th Cir. 1973)). "The existence of a single conspiracy will be inferred where the activities of one aspect of the scheme are *necessary or advantageous* to the success of another aspect or to the overall success of the venture, where there are several parts inherent in a larger common plan." *Id.* at 416 (emphasis added). Here, evidence exists that prior to the alleged conspiracy, Bay Insulation aggressively priced its goods at a low level that sent the market into a price war. Smigel (of Therm-All), who only did business in the north, complained that Bay Insulation's low prices resulted in a "dog-eat-dog market." Evidence thus suggests that without the continuous cooperation of all conspirators involved, the

17

price-fixing conspiracy would have collapsed. It appears advantageous, and ultimately necessary, for all alleged conspirators to have engaged in fixing prices if the alleged conspiracy were successful.

The third consideration—whether participants in the various dealings overlap—also supports an inference of a single conspiracy. In *United States v. Richerson*, 833 F.2d 1147, 1154 (5th Cir. 1987), this Court opined that "[p]arties who knowingly participate with core conspirators to achieve a common goal may be members of an overall conspiracy." This Court further explained:

> A single conspiracy exists where a "key man" is involved in and directs illegal activities, while various combinations of other participants exert individual efforts toward a common goal. . . . The members of a conspiracy which functions through a division of labor need not have an awareness of the existence of the other members, or be privy to the details of each aspect of the conspiracy.

*Id.* (internal citation omitted); *accord Morris,* 46 F.3d at 416-17. Here, evidence exists that Rhodes (of Mizell Co.) was a key actor in the alleged illegal price fixing, policing and contacting all other conspirators, including Therm-All. Thus, the jury could have inferred that Rhodes acted as a "core conspirator" to achieve the common goal of fixing prices for all participants.

Because evidence supports the existence of (1) a common goal, (2) the necessity of continuous cooperation among the conspirators for the conspiracy's success, and (3) the presence of a key actor coordinating the efforts of the conspirators, we conclude that no fatal variance arises between the indictment and the proof at trial.

**(2) Therm-All's substantial rights**

Assuming *arguendo* that a variance did exist between the indictment and the proof at trial, Therm-All fails to show that it was prejudiced. "When the indictment alleges the conspiracy count as a single conspiracy, but the government proves multiple conspiracies and a defendant's involvement in at least one of them, then clearly there is no variance affecting that defendant's

substantial rights." *United States v. Morrow*, 177 F.3d 272, 291 (5th Cir. 1999) (internal quotations omitted). As discussed above, the evidence was sufficient to support the jury finding that Therm-All was involved in the conspiracy.

**D. Jury instruction**

Defendants argue that the district court improperly instructed the jury in two ways: (1) by failing to include a jury instruction on competitive pricing; and (2) by failing to include intent as an element of the antitrust violation. Their argument fails. "We recognize that[] when a defendant properly requests an instruction on a theory of defense that is supported by some evidence, it is reversible error not to adequately present the theory." *United States v. All Star Industries*, 962 F.2d 465, 473 (5th Cir. 1992). Nevertheless, "[w]hen a charge is challenged on appeal, we evaluate it in its entirety, looking to see whether the charge as a whole was correct." *United States v. Hagmann,* 950 F.2d 175, 180 (5th Cir.1992); *accord All Star*, 962 F.2d at 473.

With respect to the Defendants' first point of error, the district court instructed the jury as follows:

> Mere similarity of prices charged does not, without more, establish the existence of a conspiracy . . . . Nor is it illegal to . . . exchange pricing information without more.
> . . .
> A person or company may lawfully charge prices identical to those charged by competitors and may even copy the price lists of a competitor or follow and conform exactly to the price policies and charges of a competitor as long as the person or company does not do so pursuant to a price-fixing agreement or mutual understanding with a competitor.
> . . .
> Conduct that is as consistent with permissible competition or independent action as with illegal collusion, standing alone, is not sufficient to prove that the Defendant joined the conspiracy.
> . . .
> You should consider all of the evidence, giving it the weight and credibility you think it deserves, when determining whether similarity of pricing resulted from independent

19

acts of businesses competing freely in the open market or whether it resulted from a mutual agreement or understanding between two or more conspirators.

These jury instructions demonstrate that the district court instructed the jury as to how evidence of competitive pricing could be favorable to the Defendants. The first part of Defendants' argument is therefore without merit.

Defendants' second assignment of error with respect to the jury charge is that the district court failed to include intent as an element of the antitrust violation. For this proposition, they rely on *United States v. Gypsum*, 438 U.S. 422, 430 (1978). In *Gypsum*, the Government produced circumstantial evidence of a price-fixing conspiracy in the form of information exchanges between the companies about prices. *Id.* The district court instructed the jury that it could presume the element of intent if the effect of the information exchanges was to raise, fix, maintain, and stabilize prices. *Id.* On appeal, the Supreme Court reversed the defendants' convictions, stating that intent is an "element of a criminal antitrust offense which must be established by evidence and inferences drawn therefrom . . . ." *Id.* at 435.

This Court interpreted the *Gypsum* holding in *United States v. Cargo Service Stations, Inc.,* 657 F.2d 676 (5th Cir. 1981). In so doing, this Court opined that convictions in a price-fixing case "would be valid even if they rested solely on circumstantial evidence so long as the jury was required . . . to find that defendants knowingly engaged in a conspiracy to fix prices." *Cargo Service*, 657 F.2d at 683 n.5. In the instant case, the district court instructed the jury as follows: "[T]he Government has to prove beyond reasonable doubt that the Defendant knowingly agreed with a competitor to raise, fix and maintain prices, and that the Defendant actually intended to carry out the agreement in fact." According to *Cargo Service*, the district court's jury instruction was completely

20

valid. Defendants' argument fails.

## E. Alleged prosecutorial misconduct

Defendants contend that the district court erred in denying their motion for new trial because the Government allegedly argued facts to the jury for which there was no supporting evidence. When considering whether a prosecutor's remarks cast doubt on a jury's verdict, this Court examines "(1) the magnitude of the statement's prejudice, (2) the effect of any cautionary instructions given, and (3) the strength of the evidence of the defendant's guilt." *Morrow*, 177 F.3d at 298 (quoting *United States v. Tomblin*, 46 F.3d 1369, 1389 (5th Cir.1995)). "A defendant must show that the prosecutor's statements affected his substantial rights." *Morrow*, 177 F.3d at 298.

### (1) Therm-All's argument

Therm-All argues that the prosecutor incorrectly characterized an evidentiary document from the price book of Rhodes (of Mizell Co.) as a "draft Therm-All price sheet." Yet Smigel (of Therm-All) admitted that the document was a draft price sheet. Furthermore, the district court immediately instructed the jury that the prosecutor's statement was only "argument by counsel," and that if this argument "should differ from your views, you follow your own views of the evidence." The statement does not appear to have created prejudice.

Therm-All next contends that the prosecutor improperly stated that Kaczmarek (of Therm-All) "handed off" a price sheet to a CGI representative. In fact, however, the prosecutor stated that Kaczmarek had denied providing CGI a price sheet, and then the prosecutor rhetorically asked if that denial "made sense" in view of the fact that Smigel (of Therm-All) and Kaczmarek had worked closely together. The prosecutor never actually stated that Kaczmarek provided CGI with a price sheet. Moreover, even if the prosecutor had made such a statement, evidence supports that assertion.

21

CGI produced the disputed document, indicating that it was in CGI's possession, and Smigel had testified that the document bore the handwriting of Kaczmarek.

Therm-All lastly contends that evidence does not support the prosecutor's argument that Engebretson (of Therm-All) sent Ferry (of CGI) a price sheet. We first note that Therm-All never objected to the prosecutor's statement before the district court, so we review the disputed statement for plain error. *See United States v. Munoz*, 150 F.3d 401, 415 (5th Cir. 1998). With respect to the evidence, Engebretson testified that he had conversations with Ferry, and specifically remembered that they had spoken about pricing. Engebretson's telephone records reveal that on June 8, 1995, he had a short conversation with Ferry, and sent Ferry a fax on June 15, 1995. Based on that evidence, the prosecutor argued that Engebretson was talking to Ferry about pricing, and that he was "sending [Ferry] a price sheet—exchanging pricing." The prosecutor also argued that Engretson was faxing "stuff" to Ferry through June 15, 1995, and was talking to Ferry about prices.

Therm-All complains that these two comments are completely unsupported by the evidence. This contention is unavailing. Even though no direct evidence may have existed that Engebretson (of Therm-All) faxed a price sheet to Ferry (of CGI), the magnitude of the alleged prejudice appears minimal given that evidence did exist that Engebretson conversed with Ferry about pricing, and faxed documents to Ferry. Indeed, Engebretson's testimony substantially supports the Defendants' guilt even without the assertion that he faxed a price sheet to Ferry. We thus conclude that the prosecutor's suggestion that Engebretson faxed Ferry a price sheet does not constitute plain error.

**(2) Supreme's Argument**

Supreme argues that the prosecutor improperly referred to the grand jury testimony of Supreme employee, Miranda. While it is true that the government may not bolster a witness's

credibility with prior grand jury testimony that is not in the record, *see United States v. Murrah*, 888 F.2d 24, 26 (5th Cir. 1989), this sort of violation is not present here.  Miranda testified at trial that the answer he was providing was the same as his testimony to the grand jury.  Thus, the record supported the prosecutor's argument that the grand jury testimony supported the credibility of Miranda's statement.  Moreover, the district court stated the following limiting instruction after Supreme objected to the prosecutor's statement: "There is no evidence from the grand jury before us . . . .  But, even if there is any grand jury [testimony] . . . , it is not introduced for the truth.  You may not rely on grand jury testimony, period, for anything except . . . credibility of a witness . . . ."  Given the content of the record, and the limiting instruction of the district court, denying the motion for new trial was not an abuse of discretion.

Supreme also argues that the prosecutor improperly referred to the plea agreement of Rhodes (of Mizell Co.) as evidence of a nationwide price-fixing conspiracy.  This argument is tenuous, however, because after referring to the plea agreement as such, the prosecutor recanted his statements.  The district court instructed the prosecutor to "make it clear that [Rhodes'] plea of guilty is to be considered by the jury only as it weighs on his own credibility."  The prosecutor then stated to the jury: "I just got in a little trouble. . . . Mr. Rhodes' plea agreement comes in to you to solely assess his credibility and not as evidence against the Defendant in this case.  And that's absolutely true."  The district court then added: "The existence of that plea agreement is not evidence against anybody in this trial."  Given these statements, the district court appears to have corrected any prejudicial effect of the reference to Rhodes' plea agreement.  No abuse of discretion is apparent.

## F.  Discovery violation

Therm-All argues that the Government violated Federal Rule of Criminal Procedure

16(a)(1)(C) by failing to turn over certain telephone records of Therm-All employees during discovery.[9] As a preliminary matter, we note that Therm-All forfeited this argument by failing to raise it before the district court. "[P]lain forfeited errors affecting substantial rights should be corrected on appeal only if they 'seriously affect the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Calverley*, 37 F.3d 160, 164 (5th Cir. 1994) (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)). Consequently, unless the error is plain and affects Therm-All's substantial rights, we decline to find an abuse of discretion for the court's alleged failure to correct the error. *See id.* at 162.

The phone records that the Government failed to turn over represented phone calls that Therm-All employees made during the early 1990s. Therm-All points out that those records did not show that Engebretson (of Therm-All) or Smigel (of Therm-All) called Rhodes (of Mizell Co.) or Maloof (of Bay Insulation). Therm-All contends that this evidence demonstrated an absence of contact between the alleged conspirators, thereby making the evidence material to its defense.

Therm-All's argument does not rise to the level of plain error. Direct evidence existed that Therm-All participated in the conspiracy, including testimony that Smigel (of Therm-All) agreed to set prices, that Smigel and Rhodes policed the agreement, and that Engebretson (of Therm-All) was involved, all of which were corroborated by documentary evidence. Furthermore, if telephone records were important to its defense, Therm-All had the means and opportunity to establish what its own telephone records either proved or did not prove. In short, Therm-All has in no way demonstrated that the Government's action affected the fairness or integrity of the trial.

### IV. CONCLUSION

---

[9] Supreme does not appeal this point of error.

24

For the foregoing reasons, we AFFIRM the district court's judgment against both Therm-All and Supreme.